## DURWOOD v. COMMISSIONER OF INTERNAL REVENUE.

### No. 13415.

Circuit Court of Appeals, Eighth Circuit.
Feb. 6, 1947.

William G. Boatright, of Kansas City, Mo., for petitioner.

Meyer Rothwacks, Sp. Asst. to Atty. Gen. (Sewall Key, Acting Asst. Atty. Gen., A. F. Prescott and Fred E. Youngman, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before GARDNER, THOMAS and JOHNSEN, Circuit Judges.

GARDNER, Circuit Judge.

This matter is before us on petition to review a decision of the Tax Court which held the petitioner liable for deficiencies in income taxes for the taxable years 1938 to 1941, both inclusive.

The basic facts are not in dispute. Petitioner has engaged in the operation of motion picture theaters for about thirty years. From 1933 to 1937, both inclusive, he operated a circuit of from nine to thirteen theaters under a partnership agreement executed annually by him and his three younger brothers, Barney Dubinsky, Irwin Dubinsky and H. W. Dubinsky (in 1938 petitioner changed his name from Ed. Dubinsky to Ed. Dubinsky Durwood). Under these agreements all profits and losses resulting from the operation of the theaters were to be shared equally by the four parties. On January 3, 1938, petitioner, his three brothers and his son, Stanley H. Durwood, then eighteen years of age, entered into a partnership agreement for the operation of a circuit of theaters for a period of two years commencing January 1, 1938. It was provided that from January 1, 1938, to and including December 31, 1938, the profits and losses were to be shared on the basis of 20 per cent by each party, and in the second year of operation they were to be shared as follows: petitioner, 35 per cent; Barney Dubinsky, 20 per cent; Irwin Dubinsky, 20 per cent; H. W. Dubinsky, 5 per cent; Stanley H. Durwood, 20 per cent. Petitioner was made general manager with full power and authority to attend to the business in connection with the operation of these theaters and was designated as sole custodian of all moneys and funds arising from the partnership business. The property of the petitioner in the theaters was not affected except as to operation.

On January 3, 1940, the same parties and Celia D. Durwood, wife of petitioner, since deceased, executed a similar agreement by

which the profits and losses were to be shared as follows: petitioner, 35 per cent; Barney Dubinsky, 10 per cent; Irwin Dubinsky, 10 per cent; H. W. Dubinsky, 5 per cent; Stanley H. Durwood, 15 per cent; Celia D. Durwood, 25 per cent. On January 3, 1941, petitioner, his three brothers, his wife, his son and his daughter, then nineteen years of age, entered into an agreement to operate the theater properties for a period of one year, starting January 1, 1941 and ending December 31, 1941. This agreement was similar in form to the one of January 3, 1940, except that profits and losses were to be shared as follows: petitioner, 21 per cent; Barney Dubinsky, 10 per cent; Irwin Dubinsky, 10 per cent; H. W. Dubinsky, 5 per cent; Stanley H. Durwood, 18 per cent; Celia D. Durwood, 18 per cent; M. B. Durwood, 18 per cent.

During the years 1938 to 1941, inclusive, various theaters in Kansas City, Missouri, in Jefferson City, Missouri, in St. Joseph, Missouri, and in Leavenworth, Kansas, were operated under the agreements above described. Some of these theaters were owned by petitioner, while others were held under lease by him, and some of them were held by Stanley H. Durwood, others were held by Celia D. Durwood, and at least two were held by M. B. Durwood, under leases. Under date October 1, 1939, Stanley Hugh Amusement Company, a corporation controlled by petitioner, leased the Liberty Theater in Kansas City, Missouri, to Stanley H. Durwood at a rental of $2,192.98 per month, plus taxes, upkeep and insurance. Stanley met all the lease obligations and remained the lessee under this lease to the time of the hearing before the Tax Court. After entering into this lease he placed the Liberty Theater in the pool of properties under the operating agreement. During the years in question Stanley devoted four months of each year to the business of the partnership, acting as Assistant Manager in various of the theaters in the circuit. At the end of 1938 the books of the partnership showed that Stanley's share of the profits was $6,397.40, of which he withdrew in cash $745. In the partnership tax return for 1938, Stanley was credited on the books with a salary of $6,500 but the salary was not withdrawn by him, so

that at the beginning of 1939, he had a credit account on the books of $6,387.40, representing the amount of his profits for 1938, less the withdrawals. His profits for the year 1939 were $14,605.03 and the withdrawals were $1,964.05, leaving a total credit in his account on the books of the partnership of $19,288.38 at the close of 1939. In 1939 he was credited with a salary of $6,500, which he did not withdraw.

On December 30, 1939, petitioner leased to Celia D. Durwood, his wife, the Capitol, State, Jefferson and Gem Theaters in Jefferson City, Missouri, and she obligated herself to pay a rental of $300 per month, plus taxes, upkeep and insurance. She placed these theaters in the pool of properties under the operating agreement. On April 1, 1940, Richard Mark Amusement Company, a corporation controlled by petitioner, leased the Electric Theater at St. Joseph, Missouri, to Celia D. Durwood. As lessee she obligated herself to pay a rental of $2,083.33 per month. After entering into this lease she placed this theater in the operating pool and she fully performed all the obligations under the lease during 1940. Her profits accruing to her under the operating agreement were left untouched to her credit in the partnership account.

During the year 1940, Stanley H. Durwood was a student at Harvard University, but as noted he spent four months of each year working in the theaters. In August, 1940, he acquired a lease on the Missouri Theater in St. Joseph, Missouri, which he also placed in the pool of properties under the operating agreement. All of the obligations of this lease had been performed by him up to the time of the hearing.

On December 28, 1940, the Electric Theater lease from Richard Mark Amusement Company to Celia D. Durwood was canceled, and thereafter the property was leased to M. B. Durwood, petitioner's daughter. The rentals under this lease commenced at $20,000 for the first year, to be decreased $500 each succeeding year so that for the fifth and final year of the lease the lessee would pay a rental of $18,000. M. B. Durwood has fully performed all her obligations as lessee under this lease, and this property was placed in the pool of proper-

ties under the operating agreement. She had withdrawn practically none of the profits accruing to her, but they were credited to her on the books of the partnership in very substantial amounts.

So far as the terms of the leases to Stanley H. Durwood, Celia D. Durwood and M. B. Durwood are concerned, they did not obligate the lessees to place the properties in the operating pool, and there is undisputed evidence that the leases had substantial value. The books of account contained an account in the name of petitioner and each of his brothers, which at the beginning of 1938 contained a credit balance of the amount of profits accumulated by each at that time and not withdrawn. Each year the share of profits and contributions, if any, were credited to each account and withdrawals were debited to each account. Similar accounts were opened for petitioner's son in 1938, for his wife in 1940, and for his daughter in 1941. Petitioner's brothers devoted their entire time to the business when in good health and were managers of theaters in cities other than Kansas City. Between ninety and one hundred persons were employed in the operation of the various theaters. Petitioner spent most of his time in the main office in Kansas City. He negotiated for and entered into all contracts with producers of films for exhibition in the various theaters. He previewed all important pictures prior to rental thereof. This was done about six months before the pictures were shown. From 1929 his wife, except when ill or absent, accompanied him to the previews, but she previewed no pictures without petitioner being present and she had acquired her experience in the motion picture business by association with her husband. Stanley H. Durwood graduated from high school at Kansas City, Missouri, in June, 1939, and in September of that year he entered Harvard University, graduating in 1943, when he entered the army. He had been employed around the theaters since he was twelve years old during vacation periods, and it was the desire of his father that he learn the motion picture theater business so that he could continue it after petitioner retired. The son was not much inclined to enter the business and petitioner had difficulty in persuading him to do so. The daughter, M. B. Durwood, performed no service at any time in the theaters.

In determining the taxes involved, the Commissioner included as taxable income to the petitioner the distributive shares of the profits which, according to the books of the partnership, belonged to his son, his wife and his daughter. The Tax Court sustained the action of the Commissioner and from that decision the taxpayer, petitioner herein, seeks review. He contends that: (1) the partnership was a bona fide one to which the wife, son and daughter of petitioner made contributions of property and to which they contributed services; (2) there was no transfer of income from petitioner in any event; (3) compensation should be allowed the wife, son and daughter if the above contentions are not to be permitted, for use of the leasehold properties, their services, and their money left in the partnership from year to year.

The Tax Court was of the view that this case was governed by the family partnership doctrine announced by the Supreme Court in Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, and Lusthaus v. Commissioner, 327 U.S. 293, 66 S.Ct. 539. Petitioner, however, contends that the facts in this case are materially different from those which determined the Tower and Lusthaus cases. In those cases the wives of the taxpayers, who in form became partners with their husbands, in fact contributed nothing either in capital or services to the partnership, but their alleged contributions came directly and solely from their husbands and the resulting income to the wives directly reduced the incomes of their husbands. Here it is pointed out that the son, wife and daughter each transferred to the pool leases which they owned and under which they were not only obligated to pay but did pay the stipulated rentals. It is also insisted that these partners contributed to the capital of the partnership the amounts of profits arising from the operation of the rentals which stood in their respective names on the books of the partnership and which they as a matter of law owned and could have withdrawn. Thus, it is argued that the son, daughter and wife made contributions to the capital of the partnership.

In support of the contention that there comes a time when the connection between the original donor and earnings upon earnings from the gift becomes too remote for practical consideration, petitioner cites the cases of Abe Schreiber v. Commissioner and J. C. Shaprow v. Commissioner, 6 T.C. 707. In the cited cases two husbands and wives attempted to set up a family partnership. The year following the formation of the partnership, the wives bought a building out of distributions to them from the partnership profits and this building was then rented to the family partnership. The wives reported the rentals as their own separate income but the Commissioner reallocated this income to the husbands on the theory that the rentals and buildings stood on the same basis as the family partnership. The Tax Court held that the partnership might deduct the rent and that the wives were properly taxable thereon. In the course of the opinion it is said: "We do not find reason to tax petitioners with the income from the property. The wives had received as their own, with the consent of their husbands, the money with which that property was purchased. It was, as we have held, the income of the husbands, but in substance it was given to the wives, and we may not say that property purchased therewith or the income therefrom belongs to the husbands. * * * In our opinion the income of property owned by the wives, though purchased with moneys held income to their husbands, was not income to their husbands. We so hold."

Applying the doctrine of these cases to the case at bar, it is argued that at the end of 1939 Stanley H. Durwood had to his credit $19,288.38, which he could have withdrawn without any accounting to the petitioner. Instead of withdrawing it, he contributed this balance as operating capital to another partnership in another year. On the same theory it is argued that contributions were likewise made to the capital by petitioner's wife and daughter. These facts, it is urged, distinguish the instant case from the Tower and Lusthaus cases. We find it unnecessary to determine the effect of these admitted differences in the facts in the instant case and the facts which form the basis of the doctrine of family partnership announced in the Tower and Lusthaus cases because we think there is another difference of controlling importance.

■ So far as the federal income tax law is concerned, an association for purposes of business by members of a family, even though recognized as valid as a partnership by state law, is not to be treated as such where the taxpayer for the purpose of a reduction in his income taxes, shifts some of his property to other members of his family while remaining in control of its operation. The vice of such an arrangement consists of the attempt to shift income from the taxpayer to his near relatives without any significant economic change. In the course of the opinion in the Tower case, supra, [327 U.S. 280, 66 S.Ct. 536] the court said: "But the situation is different where the taxpayer draws a paper purporting to sell his partnership interest even to a stranger, though actually he continues to control the business to the extent he had before the 'sale' and channels the income to his wife. Then a showing that the arrangement was made for the express purpose of reducing taxes simply lends further support to the inference that the husband still controls the income from his partnership interest, that no partnership really exists and that earnings are really his and are therefore taxable to him and not to his wife. * * * The issue is who earned the income and that issue depends on whether this husband and wife really intended to carry on business as a partnership. * * * It is the command of the taxpayer over the income which is the concern of the tax laws. Harrison v. Schaffner, 312 U.S. 579, 581, 582, 61 S.Ct. 759, 761, 85 L.Ed. 1055. And income earned by one person is taxable as his, if given to another for the donor's satisfaction. Helvering v. Horst, 311 U.S. 112, 119, 61 S. Ct. 144, 148, 85 L.Ed. 75, 131 A.L.R. 655. * * * For if under circumstances such as those now before us, the end result of the creation of a husband-wife partnership, though valid under state laws, is that income produced by the husband's efforts continues to be used for the same business and family purposes as before the partnership, failure to tax it as the husband's income would frustrate the purpose of 26 U.S.C. § 22(a), 26 U.S.C.A.Int.Rev. Code, § 22(a). * * * Judged by the

actual result achieved, the Tax Court was justified in finding that the partnership here brought about no real change in the economic relation of the husband and his wife to the income in question."

It is to be observed that the Tower and Lusthaus cases involved husband and wife alone. Here, brothers of petitioner were partners with him in a partnership conceded to be at all times valid even for income tax purposes. This partnership was expanded to admit petitioner's wife, son and daughter, and from the commencement of the partnership with his brothers until 1938, he and his three brothers divided the profits equally. In 1938, the son was added as a partner and losses and profits were divided equally among all five during the first year and in the second year petitioner was to have 35 per cent, Barney Dubinsky was to have 20 per cent, Irwin Dubinsky was to have 20 per cent, H. W. Dubinsky was to have 5 per cent, and Stanley H. Durwood was to have 20 per cent of the profits and losses. While in 1940, petitioner's share remained at 35 per cent, Barney Dubinsky was reduced to 10 per cent, Irwin Dubinsky to 10 per cent, H. W. Dubinsky remained at 5 per cent, Stanley H. Durwood was reduced to 15 per cent, and Celia D. Durwood was placed at 25 per cent. In the 1941 agreement, petitioner's share was placed at 21 per cent, while the shares of the brothers remained the same as the year before, and petitioner's wife, son and daughter each received 18 per cent. The result of these transactions so far as they affected the income of the petitioner shows that in 1938 his interest was reduced 5 per cent, as was the share of his brothers, which went to make up the 20 per cent allocated to Stanley H. Durwood. In 1939, the share of petitioner was increased to 35 per cent, which came out of the share of H. W. Dubinsky. Celia D. Durwood's interest of 25 per cent in 1940 came out of Barney Dubinsky to the extent of 10 per cent, out of Irwin Dubinsky to the extent of 10 per cent, and out of Stanley H. Durwood to the extent of 5 per cent. In 1941, petitioner's share was reduced to 21 per cent, Stanley's share was reduced to 18 per cent, as was the share of petitioner's wife, while the daughter, added as a partner, re-

ceived 18 per cent. In the entirety, absolutely no avoidance of taxes by petitioner was effected. For two years his share was much larger than it had ever been before 1938, and in the other years it did not vary in any substantial amount from what it had previously been. The great bulk of the share going to the wife, son and daughter came not from petitioner but from his brothers, and hence, it did not and could not reduce petitioner's income. The only basis upon which it could be held that the income was taxable to the petitioner is that he had diverted a part of his income to others, members of his family, but that is not this case. A somewhat similar situation was presented to the Tax Court in S. Kenneth Alexander v. Commissioner of Internal Revenue, 6 T.C. 804. In that case the taxpayer owned a three-fourths interest in a business and an uncle owned a one-fourth interest. The taxpayer made arrangements for his wife to buy the uncle's interest. The purchase price of that interest was $35,000, of which $30,000 was provided by a bank loan made on the note endorsed by taxpayer and further secured by collateral of the taxpayer. The court held that the resulting partnership between the taxpayer and his wife should be recognized for federal income tax purposes. The distinction which the Tax Court found between the Alexander case and the Tower and Lusthaus cases was that the wife had received her interest from an uncle rather than from her husband, even though the husband had made it possible for her to secure the money with which to purchase the interest. The Tax Court said: "This one-fourth did not originate with or come to the wife from the petitioner. * * * It was purchased from the uncle. * * * The loan of his name as endorser, which cost him nothing, likewise fails to indicate sham or unreality in the uncle's sale to petitioner's wife. We see nothing here that a husband might not reasonably do in assisting his wife, and not himself, to acquire another's partnership interest." See, also, Harry Shulak v. Commissioner, T.C. Decision No. 6654, April 30, 1946, 6 T.C. 1260.

Here, as in the Alexander case, the interest of the son, wife and daughter did not come from petitioner.

The Commissioner contends that petitioner could command the income of the partnership at will, and hence, whatever was taken from his brothers and given to his wife, son and daughter as income in reality came from him. The extent to which fact findings of the Tax Court are conclusive on review has often been stated, but there must be some evidence to sustain them. If there is no evidence in support of the finding, the decision can not, of course, stand. An inference or hypothesis that absent the added partners the brothers would have permitted the same income shifts to petitioner is purely speculative and not a fact. The order of the Tax Court is therefore reversed and the cause remanded with directions to enter order in conformity with this opinion.