## KENT v. COMMISSIONER OF INTERNAL REVENUE.

No. 10617.

United States Court of Appeals Sixth Circuit.

Sept. 27, 1948.

Lewis R. Donelson, III, of Memphis, Tenn. (Lewis R. Donelson, III and Allan

132

Davis, both of Memphis, Tenn., on the brief), for appellant.

Louise Foster, of Washington, D. C. (Theron L. Caudle, Charles Oliphant, Sewall Key, Rollin H. Transue, A. F. Prescott and Louise Foster, all of Washington, D. C., on the brief), for appellee.

Before SIMONS, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Petitioner sought redetermination of deficiencies in income taxes, which were asserted by the Commissioner for 1940 and 1941. The result of respondent's action was to tax petitioner on certain income arising out of three different partnerships: (1) Southern Air Services; (2) the Pine Bluff School of Aviation; and (3) Helena Aero Tech School. Petitioner claims that his wife was the owner of the interests in the partnerships which were taxed to him. An additional issue in the case is whether petitioner is taxable on a gain resulting from a corporate liquidation.

This controversy arises out of the following circumstances: William R. Kent, at the time of the events leading up to this suit, was a successful businessman in many fields of endeavor. He was also a pioneer enthusiast of aviation. He started flying as early as 1916, when he first bought an old Navy plane which he flew along the shores of Lake Michigan near his summer home. He subsequently qualified for and obtained a pilot's license in 1927. In 1934, he organized Southern Air Services, Inc., which operated charter flying service and a training school for flying. The venture was set up as a corporation, principally to avoid personal liability for damages resulting from airplane crashes. Another purpose of adopting the corporate form was to avoid confusion with, and keep the concern separate from petitioner's other business interests. The new enterprise was a subordinate activity for petitioner. For some years, it was operated at a loss, and it was not until three years after its organization that it showed a net operating profit, and six years before its accumulated deficit was wiped out. Commencing in 1937, petitioner, the owner of all the stock, was paid a salary of $150 per month, as president. The business was always conducted by a salaried manager. In 1940, the manager was J. F. Lanier, who was paid a salary of $400 per month. He had been employed since 1936. All during this time, petitioner was engaged in his other business enterprises, of which the principal seems to have been the Anderson-Tully Company, a lumber concern, to which petitioner devoted a considerable part of his time; and this company was his chief means of support in 1940 and 1941. In the latter year, he drew from it a salary of $32,000.

During the fall of 1940, petitioner was approached by the United States Army, with a view to establishing a primary training flying school for Army pilots. The government contracting agent indicated that past experiences made the Army reluctant to deal with a corporation, and urged petitioner to establish an independent business, of a partnership character, in order to enter into the proposed government contract. The Army objected, in some measure, to doing business with Southern Air Services, Inc., because of its corporate form. It was stated that it had been found that it was cumbersome and delaying to deal with corporations. Furthermore, the Army had come to the conclusion that contractors operating Army schools in conjunction with civilian flying schools were faced with problems of divided allegiance, which did not work to the best interests of the Army. The new venture, then, was to be, at the Army's request, entirely separate from the civilian training school operated by Southern Air Services, Inc.

In order to bring about such a complete separation of interest in the two schools—the civilian flying school, already in operation, and the Army training school to be organized—petitioner, following the plan and request of the Army, gave up all his interest in the civilian school, and organized a new partnership to create and operate a new Army training school. He did it in this wise: On October 31, 1940, being the owner of all the stock in the corporation, Southern Air Services, Inc., he transferred the total of the common and preferred stock to Lanier, the general manager, and to his wife, Louise C. Kent. He sold to

Lanier 7½ shares of preferred stock and one share of common; he made a gift to his wife of 67½ shares of preferred, and 9 shares of common. On the same day, a special meeting of the stockholders was called for the purpose of dissolving the corporation and surrendering its charter, which was done by resolution. At the meeting, petitioner acted as president, Lanier, as vice president, and Bertrand W. Cohn, the attorney for the corporation, as secretary. These three were also the directors of the company. Later, on the same day, a partnership agreement was executed by Mrs. Kent and Lanier, in which they agreed to carry on as partners, under the style of Southern Air Services, the business formerly conducted by Southern Air Services, Inc.

On the dissolution of the corporation, its assets were distributed to the stockholders of record, Mrs. Kent and Lanier. Mrs. Kent reported this distribution as a long-term capital gain, on her income tax return for 1940, and paid the tax thereon. The assets received by Mrs. Kent and Lanier from the distribution were contributed to the new company formed by them as partners. The gift of stock to his wife whereby petitioner severed all relationship with the civilian flying school, was unconditional, irrevocable, and in conformity with the laws of the State of Tennessee regarding stock transfers. Furthermore, petitioner filed a federal gift tax return for the year 1940, showing a gift of the shares of stock to his wife at a valuation of $28,501.48, the same valuation per share which was placed upon the stock sold to Lanier. The Civil Aeronautics Administration was also informed by letter dated November 1, 1940, of the change in ownership from the corporation to the partnership composed of Mrs. Kent and Lanier.

It should here be emphasized that the giving of the stock by petitioner to his wife is the crux of this case. Upon it, depends the validity of petitioner's contentions with respect to all three partnerships, Southern Air Services, Pine Bluff School of Aviation, and Helena Aero Tech. If, in this case, petitioner prevails on the issue of the gift of stock, he prevails on the issue affecting all the partnerships, and if he fails on the issue of the gift, he fails in his contentions on all the partnerships.

It is the claim of the government that Mrs. Kent never became a partner of Lanier, but that it was only an alleged partnership in which petitioner substituted his wife for himself in the business, in order to escape liability for tax on a portion of the income received from the civilian flying school.

Subsequent to the Southern Air Services transaction on October 31, 1940, petitioner proceeded with his plans for setting up an Army flying school, and on December 11, 1940, he went to Akron, Ohio, to sign a contract with the United States Army for the operation of such a school. The Army contract, which petitioner saw for the first time on that day, required, among other things, that the contracting party be the holder of a Civil Aeronautics Administration certificate for the operation of an advanced flying school. Petitioner had contemplated when he arrived in Akron that this Army school would be operated by a corporation in which the stock would be held by himself and Cohn, his attorney and lifelong friend, and members of the Cohn family. Petitioner had, of course, considered the idea of forming a partnership to operate the proposed school, in accordance with the suggestion of the Army, but because he could not see how the interested parties were going to procure the necessary capital through a partnership arrangement, and because they felt they could do so by means of a corporation, they had abandoned the partnership idea and resolved to carry out their plan through a corporation. But when, upon their arrival in Akron, they read the provisions in the Army contract requiring that in order to contract with the Army, they be possessed of a Civil Aeronautics Administration certificate, for the operation of an advanced flying school, they suddenly realized that they could not operate as a corporation, for neither the proposed corporation nor any of its stockholders or directors had such a certificate, and neither they nor the corporation could have secured one from the Civil Aeronautics Administration. The only way they could avail themselves of such a document was to tie Southern Air

Services, or its partners, in some way into the transaction, as that partnership was the owner of such a certificate. So, in spite of the fact that it was a complete reversal of the plan to have the civilian school and the Army school entirely separate as far as elements of ownership went, in accordance with the suggestions and wishes of the Army officers who had carried on the negotiations, it was then decided to bring Mrs. Kent and Lanier into the project in order that the corporation could be the beneficiary of the Civil Aeronautics certificate, which was owned by Mrs. Kent and Lanier as partners in the civilian school. This was determined on, even at the risk of having all the arrangements with the Army go to pieces because of not following its instructions as first given. They were in such a situation that they had to take that chance. It was the only thing they could do.

The new venture, accordingly, was organized as a partnership under the name of Pine Bluff School of Aviation, with petitioner Kent, Cohn, and Mrs. Kent, as partners. Lanier was included in a profit-sharing arrangement but not as a partner, because the others did not think it was fair to get him involved in such a risky venture. The partnership agreement provided a 37½% interest for petitioner, 35% for Mrs. Kent, 17½% for Cohn, 5% on a profit-sharing basis to Lanier, and a like percentage on the same basis to Deweese, who was hired as a full-time manager. Petitioner contributed credit and collateral to secure loans which the partnership made to finance its operations; Cohn contributed $25,000 in cash which was used for initial expenses; and Mrs. Kent contributed the Civil Aeronautics Administration certificate, and credit to the extent of $35,000 for the training of instructors and mechanics.

When the Officers, acting on behalf of the Army, first approached petitioner on the subject of operating a school for Army pilots, they represented that it was a doubtful risk; and Kent himself knew that it was a "tremendous risk." The Army had no money for the project, and it could not get an appropriation for it through Congress. In proposing the venture to petitioner, the Army men referred to the situation in Europe, declared the nation was faced with imminent war, and stated that the Air Force had to be built up at once, and that "they had to have pilots and have them quickly." The idea of such training schools for Army pilots, operated by civilians, originated with General Arnold, Chief of the Air Force, who asked these civilian flying schools throughout the country, to take over the training of pilots, and at the same time warned them: "We are going to put you out on a limb."

Having been sought out and asked by the Army to help the country in the emergency of imminent war, although, at the same time, being warned that the venture proposed was a risk of doubtful financial soundness, petitioner proceeded to carry out the wishes of the Army.

An expenditure of $250,000 was called for by the contract for flying field and equipment. The total amount to be realized by the partnership under the contract, was less than this amount. The contract only covered the period from March 22, 1941 to July 1, 1941; and it provided merely for the training of fifty flying students at a compensation of $17 per hour. The contract, even with these modest and strictly limited provisions, could be cancelled by the government on thirty days' notice; and there was no certainty that the contract would be renewed.

The first thing petitioner Kent did was to attempt to borrow $200,000 on behalf of the partnership, to meet the required outlay for the first part of the construction work. He had been given to understand in a general way, that a line of credit would be available to the partnership, in view of the Army training program, at the Union Planters National Bank & Trust Company of Memphis; but when the bank saw the kind of contract the Army had required, of a duration of only 3½ months, subject to cancellation at any time, and with a total return under the contract of less than the loan, it refused to advance the money. Petitioner then took the matter up with the Federal Reserve Bank, and after several meetings with a committee of the bank, the request for a loan of $200,000 was again rejected. Finally, the Reconstruction Finance Corporation, principally

because of the importance of the venture to the national defense program, agreed to aid in the financing of the project. A loan was made to the copartnership in the amount of $175,000, on a note signed on behalf of the partnership by petitioner, Kent, on January 20, 1941, secured by stock in the petitioner's concern, the Anderson-Tully Company, having a market value of $200,-000. Seven and a half months later, another loan to the partnership was made by the Reconstruction Finance Corporation, in the amount of $175,000. This was secured not only by petitioner's stock in the Anderson-Tully Company, but by a mortgage to the Union Planters National Bank of all the buildings and equipment of the Pine Bluff School of Aviation; and to the foregoing was added a rigorous provision that 30% of the gross revenue of the school should be assigned for repayment of the loan to the Reconstruction Finance Corporation. So, as a result of the partnership of the Pine Bluff Flying School, and the loans made by it to carry out the Army's plan of training its pilots, we find Cohn, having contributed $25,000 in cash to the partnership, saddled with liability for repayment, with the other partners, of the vast indebtedness necessary to carry on the venture; petitioner, Kent, with $200,000 worth of his own lumber company stock pledged as partial collateral for a loan of $350,000 to the flying school; and petitioner and his wife, not only personally liable, as partners for repayment of the huge borrowings, but also personally liable for any and all other indebtedness contracted by the partnership in its construction work and operations

Never was more fragile craft launched upon the turbulent waters of finance, and by 1943, it was headed for the rocks, when it was finally rescued, and great losses saved the owners, by the benevolent and intelligent vigor of the Defense Plant Corporation, which purchased the school and re-leased it to the partners. Receipt of the purchase price enabled the partners to pay part of the loans, and the balance was paid out of funds arising from operations.

The government contends that petitioner's wife was never really a partner in the Pine Bluff School partnership, and that petitioner merely substituted his wife in name only in the venture in order to escape tax liability on part of the income which he might receive from the flying school.

The third venture in which petitioner was concerned was Helena Aero Tech. During the summer of 1941, petitioner was approached by R. A. Van Devere with a view of organizing another flying school at Helena, Arkansas. Van Devere knew about petitioner's activities in flying and in organizing schools, and wanted not only financial support but the benefit of petitioner's experience. As a result, on August 11, 1941, a partnership was entered into by petitioner, his legal counsel Cohn, and Van Devere. Cohn contributed $15,-000 for a ⅙ interest, and petitioner took a ⅙ interest, which was paid for by petitioner and his wife. Petitioner had discussed the matter with her and she was willing to go in as a partner for one-half of petitioner's interest, or 1/12 of the interest in the partnership. The ⅙ interest of petitioner and his wife was paid for by a check for $15,000 dated September 20, 1941, drawn on the account of the Southern Air Services partnership in which Mrs. Kent and Lanier were partners. The check was signed by Lanier, and half of the amount, or $7,500, was charged to Mrs. Kent's account, and $7,500, to petitioner's account with the partnership. Presumably, petitioner's account included sums earned but unpaid for advisory services. However, there is no question on the part of the government that the partnership owed him this amount of money. While Mrs. Kent was not named in the Helena Aero Tech partnership with petitioner, Cohn, and Van Devere, nevertheless, petitioner accounted to her and paid her one-half of all the income received from their interest in that partnership.

The government contends, as in the other two partnerships, that there was no reality in the so-called partnership between petitioner and his wife in Helena Aero Tech, and that it was only a blind to avoid petitioner's liability for income tax on 1/12 of any income that might be received.

The Tax Court found that the transfer by petitioner of the stock in the original

flying corporation, to his wife, was made with the intention and for the purpose of bringing about an instantaneous transformation into the ensuing controlled partnership; that the business of the original civilian aviation flying school, after it was changed to the partnership of Mrs. Kent and Lanier, continued to be under the control of petitioner; that the partnership transaction lacked reality and finality with respect to tax consequences; and that it was necessary to conclude that it was merely an "anticipatory arrangement," and, accordingly, should be treated as a "mere formalism." The court held that it necessarily followed that the Pine Bluff partnership, as well as that of Helena Aero Tech, were subject to the same infirmity, inasmuch as the assets representing Mrs. Kent's interests therein came from the gift of stock in the original flying school corporation.

· The government's claim that the partnership lacked reality with respect to tax consequences, is based upon the contention that the three partnerships, here in question, fall within the category of so-called "family partnership" cases, in which the courts have held that the interests of a taxpayer's wife in a business enterprise had no significance for income tax purposes, and that the income payable to her therefrom must be treated as taxable to her husband. Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135; Lusthaus v. Commissioner, 327 U.S. 293, 66 S.Ct. 539, 90 L.Ed. 679. It is declared that the test for determining the validity of a partnership between a husband and wife is whether it is actually their intention to carry on a business together and to share the profits and losses.

The Tax Court's construction of the Tower and Lusthaus cases, above mentioned, as well as the line of cases leading to the rule therein announced, is that lack of material income-producing services by the wife, or of capital originating with the wife, is sufficient to negative any partnership agreement between husband and wife, even in the absence of a finding of an underlying motive of tax reduction.

However, in Lawton et al. v. Commissioner, 6 Cir., 164 F.2d 380, this court

held that these were only circumstances to be considered in determining whether family partnerships would be disregarded for tax purposes. In that case, it was decided that stock in a corporation which was given to a wife by her husband who was in control of the corporation, could form the basis for the wife's share in a valid partnership subsequently created from the assets of the corporation in which the husband and wife were partners; and it was held that this was the case whether the stock had been transferred to the wife in consideration of her substantial services or transferred to her purely as a gift. It was added that, in such a case, the wife would be, for tax, as for other purposes, a partner of her husband.

In Wilson v. Commissioner, 7 Cir., 161 F. 2d 661, 663, the court said: "The Tower and Lusthaus cases delineate the tests to be applied in determining whether the family partnership is a genuine partnership for Federal income tax purposes. These tests are merely to aid in the ultimate determination of the existence of an actual, bona fide partnership."

See also Belcher v. Commissioner, 5 Cir., 162 F.2d 974; Durwood v. Commissioner, 8 Cir., 159 F.2d 400. The controlling factor in all such cases is, as was said in Commissioner v. Tower, 327 U.S. 280, 290, 66 S.Ct. 532, 537, 90 L.Ed. 670, 164 A.L.R. 1135: "It is the command of the taxpayer over the income which is the concern of the tax laws."

We come, then, to the findings of fact of the Tax Court, and, upon an examination of the record, we are of the opinion that there is no substantial evidence to sustain them.

In considering the facts as found by the Tax Court, and determining whether they were sustained by substantial evidence, Judge Simons, speaking for this court in Lawton v. Commissioner, supra [164 F.2d 383], said that it was "out of such gossamer threads of circumstance that the findings and conclusions of the Tax Court are woven, and it becomes our duty to determine whether findings and conclusions are based upon substantial evidence as that phrase has repeatedly been

defined by the Supreme Court, particularly in Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 198, 59 S.Ct. 206, 217, 83 L.Ed. 126, wherein it was said, 'substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" 164 F.2d page 383. The court continued: "We are aware, of course, that the Tax Court is not required, at all events, to believe the testimony of witnesses, or even to accept at face value documents offered in evidence, but it appears to be well settled that the fact finder may not arbitrarily disregard undisputed and uncontradicted testimony of unimpeached persons where he has already found facts which lend a flavor of truthfulness to their assertions. Hughes v. Commissioner, 5 Cir., 153 F.2d 712; Bardach v. Commissioner, supra [6 Cir., 90 F.2d 323]; Voltz v. Treadway & Marlatt, 6 Cir., 59 F.2d 643. As so well expressed by the late Judge Denison in Rookwood Pottery Co. v. Commissioner, 6 Cir., 45 F.2d 43, 45, 'when the proofs so introduced remained unchallenged by contrary proofs or by destructive analysis, it was the duty of the commissioner to decide the issue in accordance with the proof then appearing before him; and it was, we think, the duty of the board to take the same view.'"

Such findings as are mentioned in the above cases, based on inference and supposition, are not sustained by substantial evidence, and decisions based thereon call for reversal. See Simmons v. Commissioner, 5 Cir., 164 F.2d 220; Durwood v. Commissioner, 8 Cir., 159 F.2d 400. We have before us the undisputed and uncontradicted testimony of unimpeached witnesses, petitioner, his wife, Lanier, Cohn, and Colonel Smart.

It is not questioned that the entire generating force leading to the formation of the school to train Army pilots came from officers representing the Army; and the Tax Court found that the plan for an Army pilot training school was first suggested to petitioner by the Army. When petitioner was asked to embark on this venture for the Army, it is clear from the evidence that he proceeded to do so without any consideration of financial gain, and solely because he was asked to help out in the war. The Army officers, as has been said, even warned him that it was a risky financial venture; and certainly, one would not need to be expert in business affairs to be aware that a plan to borrow and spend $250,000, later increased to $350,000, on a flying field and equipment for the training of Army pilots, to be reimbursed by payment for instruction given, was a poor risk, when the contract was limited to 3½ months' duration, and cancellable at any time by the Army. The Tax Court found that the officers representing the Army indicated that past experiences made them reluctant to deal with corporations. Petitioner testified that the Army requested him to separate himself completely from his civilian flying school, in order to avoid "divided loyalties." This testimony is supported by that of Colonel Smart; and the Tax Court actually found, sustaining this proof, that the Army had represented to petitioner that contractors operating Army schools in conjunction with civilian schools were faced with problems of divided loyalties which did not work to the best interest of the Army; and that they urged petitioner to establish an independent business with a partnership form of ownership to enter into the proposed government contract. Petitioner says that is the reason that he got rid of all of his stock in the civilian school, selling some to Lanier, and giving the rest of it to his wife. It carried out what the Army asked him to do.

In its claim that Mrs. Kent did not become a real partner with Lanier, and that the partnership succeeding the civilian flying school corporation was merely a substitution by petitioner, in name only, of his wife in the venture in order to enable him to escape liability for income taxable to him, the government repeatedly contends that petitioner remained in control of the partnership and that he was consulted by Lanier from time to time on its affairs. It is true he was consulted, and was even paid $400 a month for advisory services. But here, in what otherwise might have been the only weak and suspicious aspect of petitioner's claim, it is conceded by counsel for the government,

and the Tax Court found, that this amount "was reasonable compensation for the consulting services rendered by him, and in line with the *salaries* paid by other businesses of a similar nature at that time,"—in spite of the facts that the Tax Court further found that "he did not devote much time to Southern Air Services." Petitioner occupied no position with this partnership except as a salaried advisor. There is no evidence whatever that he controlled the Southern Air Services partnership or that he made any attempt to control it. It is said by the government that he endorsed notes for the partnership long after the gift of stock to his wife. However, it turns out that all of these endorsements were on renewals of notes upon which he was already bound from the time when the business was conducted as a corporation, and he only continued to endorse such notes until they were finally paid to the banks. If he had not endorsed such renewal notes, it is a fair supposition that the banks would have collected forthwith from him personally. We see no significance in such transactions.

Government counsel makes light of the testimony of petitioner and Colonel Smart (the latter received under stipulation), that the Army did not want to deal with a corporation, by emphasizing that petitioner and Cohn had resolved to operate the new venture as a corporation, until they found that they would need the Civil Aeronautics Administration certificate in order to do business with the Army. However, the evidence is to the effect that petitioner, at the outset, did plan to follow the Army's wishes completely in this matter, and to form a partnership in accordance with its suggestion; but, subsequently, he felt that he could not get sufficient funds to carry out the project unless the school was organized as a corporation. The main reason why petitioner had separated himself from all connection with the civilian flying corporation, and decided to operate the Army school as a completely different organization, was to avoid so-called "divided loyalties"; and it is unquestioned that Mrs. Kent was finally brought into the Army school partnership—the Pine Bluff Flying School —in order that the new partnership could avail itself of the indispensable certificate which only she, as one of the partners in Southern Air Services, could contribute to it. This eventuality—the necessity of having such a certificate in order to contract with the Army—was entirely unanticipated by every one, at the time the stock in the corporation was transferred by petitioner to his wife and Lanier.

 In carrying out the project, not only did petitioner subject himself to great personal financial liability, but his wife, as a subsequent partner in the Army training school, did likewise. The Tax Court found that it was contemplated that large capital outlays would be required for the proposed Army school, and that petitioner was urged by the Army to undertake the operation not only because of his experience *but also because of the urgent need for training Army pilots.* The Tax Court could have as well found under the evidence that petitioner undertook the huge venture with every prospect of loss, with no consideration of personal gain, and at an immense personal financial · risk, in which neither petitioner's local bank, nor the Federal Reserve Bank would support him even though the project was concededly undertaken for the sake of National Defense. All the evidence in the case would certainly support such a · finding. That there was no intention on the part of petitioner to retain control of the company at the time of the gift of the stock to his wife must be held to be established by credible evidence having no aspect of unreasonableness; and from the proofs, no reasonable inference can be drawn that petitioner was attempting by the transactions in question to avoid tax liability on a portion of his income, or that he was not acting in the best of faith toward the government and from motives of deep patriotism. There are no findings that the witnesses are not to be believed; and any findings that might be made to that effect would be without substantial evidence to sustain them. The uncontested proof as to the tremendous risk, the doubtful prospect of profit to be realized from the transaction with the Army, and the complete absence of any motive of personal gain seem conclusive evidence without more that petition-

er was not concerned with escaping liability for the comparatively small tax that could be levied on income which he might or might not receive in the civilian school, when he gave his wife his stock therein in order to separate himself from that company in deference to the wishes of the Army. The project, as has been observed, after a couple of years of operation, faced catastrophe, when the Defense Plant Corporation bought it from the partners and enabled them to recoup their large capital investment. But while it almost ended disastrously from a financial standpoint, these three establishments—the Southern Air Services, the Pine Bluff School of Aviation, and Helena Aero Tech—trained more than 20,000 Army pilots during their existence and during the most dire emergency in our history. Under these admitted facts, considering the enormous risks undertaken by petitioner and his wife, the profound patriotic incentive which inspired them, their disregard of financial consequences, and those facts which the Tax Court found, that give the flavor of truth to the petitioner's assertions, we can arrive at no other conclusion than that the finding that it was petitioner's intention to continue his ownership of the civilian school, with a controlled partnership, and that he used his wife to retain such control in himself as a subterfuge, in order to avoid paying tax on income which he might receive from the civilian school, is not sustained by substantial evidence, or by any evidence in the case.

■ It is to be observed that petitioner made a gift to his wife of all of his stock in the original corporation. Such gift removed petitioner altogether from any interest in the company. In Simmons v. Commissioner, 5 Cir., 164 F.2d 220, 223, where a husband had conveyed to his wife his entire interest in a partnership, and it was argued that such a transaction was within the category of family partnerships held invalid for federal income tax purposes in the Tower case, the court said:

"To say that there is no difference in principle between a gift by the taxpayer to his wife of a part of his interest in a partnership and a gift of the whole of that interest is to ignore realities.

"The gift of only a part of his interest left undisturbed the taxpayer's economic interest in the partnership. Thereafter as before, he had the same supervision and control; he still continued to speak for the joint interest. But the gift of his whole interest removed the petitioner altogether from the partnership. Following the transfer the taxpayer had no vestige of right or control in the partnership, and it is undisputed that he in fact exercised none."

The business of Southern Air Services was not a personal service business. Capital was the important income-producing factor, as was found by the Tax Court. Petitioner terminated all of his interest in the civilian school when he made the gift of stock. The gift was irrevocable. Petitioner paid the federal gift tax on it for that year. Mrs. Kent reported the distribution of assets of the corporation to her on her income tax return for 1940, and paid the tax due thereon. She had complete control over the money from her share in the three partnerships, and did with it as she pleased. None of it was ever used for payment of any family expenses.

"No law prevents a taxpayer from making a valid gift to his wife of a partnership interest, and where, as here, he thereby divests himself of all interest and connection with the partnership, he may not thereafter be taxed with partnership income accruing to his wife, the real partner. Only partners incur income tax liability for partnership income." Simmons v. Commissioner, 5 Cir., 164 F.2d 220, 224. All the proofs in the case point to a valid and bona fide gift of the stock in question from petitioner to his wife.

■ Since the gift of the stock was bona fide and valid, Mrs. Kent had the right to contribute to the Pine Bluff Aviation School partnership the property rights she had in the Southern Air Services; and her share in the Pine Bluff School was acquired by her personally for such a consideration, which included the use of the Civil Aeronautics certificate and credit extended to the Pine Bluff School in the amount of $35,000 for the training of instructors and mechanics during the first year or so of operation. With respect to her investment in Helena Aero Tech, there

was no reason why she could not use $7,-500 of her own money standing to her credit in Southern Air Services to purchase a ¹⁄₁₂ interest in the new company from her husband. It was her own money, just as much as though it had belonged to her be-·fore her marriage to petitioner. Since the initial gift of stock has been held bona fide and valid, the government's contention that Mrs. Kent's interest in the Helena Aero Tech partnership should be taxed to petitioner on the ground that her capital contribution thereto originated with him, is not tenable, under the holding of this court in Lawton et al. v. Commissioner, 6 Cir., 164 F.2d 380, 385.

There remains one minor issue. Petitioner purchased certain shares of International Match Realization Company stock in 1934, for $525. He received liquidating dividends on the stock which, with the final dividend of $200 paid him in 1941, amounted to $525. He thus recouped all ·his costs, and in his tax return, treated the $200 as a liquidating dividend from a ,complete liquidation, and reported it as a capital gain, and not as ordinary income. It is ·admitted that if the·dividend was from a complete liquidation, it was taxable as capital gain, as is contended by petitioner. But the Tax Court held that petitioner had a benefit of a loss deduction on the stock in 1932, ,and that he should be taxed on the entire sum received in 1941. This appears clearly erroneous, for the evidence is undisputed that petitioner first bought the stock in January, 1934, and that the loss deduction was for different stock that petitioner had sold in prior years. But although counsel for respondent admit that the Tax Court was in error, unless the two sales are related, they contend that such an error in the findings of the Tax Court cannot help petitioner because it is necessary to know whether the dividend was incomplete or partial liquidation. But petitioner's tax return treated the dividend in question as a liquidating dividend from a complete liquidation; and respondent increased the amount due on petitioner's tax return, on the sole ground that it constituted a recovery of stock previously reported as worthless. We have disposed of that contention and the Tax Court decision sus-

taining it, adversely to the respondent. That was the only issue raised, considered, and determined. It does not appear that the defense now advanced by counsel was ever made or suggested prior to the filing of their brief in this court. It is too late now to argue that the petitioner's proof is insufficient to meet this newly conceived defense, and we find such a claim without merit.

In accordance with the 'foregoing, the decision of the Tax Court is reversed and the case remanded for proceedings not inconsistent with this opinion.