ROBERT L. PETERSON IRREVOCABLE TRUST #2 FOR THE BENEFIT OF SUSAN P. PETERSON, TRANSFEREE, UNION BANK AND TRUST COMPANY, TRUSTEE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Peterson Irrevocable Trust #2 for benefit of Peterson v. Commissioner
Docket Nos. 29263-81, 29264-81, 29265-81, 29266-81, 29267-81, 29268-81, 29269-81, 29270-81, 29271-81.
United States Tax Court
T.C. Memo 1986-267; 1986 Tax Ct. Memo LEXIS 343; 51 T.C.M. (CCH) 1300; T.C.M. (RIA) 86267; July 1, 1986. T. Geoffrey Lieben,Nick R. Taylor, and James W. R. Brown, for the petitioners. J. Anthony Hoefer, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: These consolidated cases arise from petitioner Robert L. Peterson's gifts of 50,000 shares of stock (or the sales proceeds thereof) to his two children and to trusts for their benefit. Before making the gifts, Peterson had entered into a contract to sell the stock for $13 per share. Peterson elected to "split" the gifts with his wife, petitioner G. Virginia Peterson, pursuant to section 2513. [2] These were "net gifts" in that the donees (children or trusts) were to pay the gift taxes, and the gifts were reported at a value of $4.50 per share. *345 This case involves both the income tax and gift tax consequences attaching to the Petersons' sale/gift of the 50,000 shares. In docket No. 29268-81, respondent determined a deficiency in the Petersons' 1976 Federal income tax in the amount of $236,711 on gain from the sale of the 50,000 shares of stock at $13.00 per share. [3] In the remaining dockets, respondent determined that the other petitioners (children or trusts) were liable as transferees for the deficiencies in Mr. and Mrs. Peterson's Federal gift taxes for the calendar quarter ended June 30, 1976. The deficiencies in gift tax were attributable solely to the difference in valuation ($13 versus $4.50 per share). Each notice of liability indicated a gift tax deficiency of $38,636, a section 6653(a) negligence addition thereto in the amount of $1,932, and interest thereon. Respondent also determined, however, that the transferee liability of petitioners Mark R. Peterson and Susan P. Peterson for such amounts is limited to $35,750 each, the fair market *346 value of the gifts they each received, as determined by respondent. [4] See sec. 6324(b). Respondent's determinations in regard to the gift tax are duplicative in that payment of Mr. and Mrs. Peterson's respective gift taxes of $38,636 each, additions to tax of $1,932 each, and interest thereon by one or any combination of the transferee-petitioners will discharge the remaining transferee-petitioners from liability therefor. *347 The issues for decision are as follows: (1) Whether petitioners Robert L. Peterson and G. Virginia Peterson are taxable on the gain reported by their children and the trusts on the sale of stock pursuant to a contract to sell such stock entered into before the gifts. This depends upon whether the rights under the contract were fixed so that the Petersons realized the gain before the transfer of the stock, as respondent contends, or whether the rights under the contract were so contingent and uncertain that the donees realized the gain on the sale, as petitioners contend; (2) The fair market value of the gifts on the date thereof; and (3) Whether Mr. and Mrs. Peterson, and therefore the transferee-petitioners, are liable for negligence additions to the gift tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Robert L. Peterson (Peterson), G. Virginia Peterson (Mrs. Peterson) (collectively, the Petersons), Mark R. Peterson, and Susan P. Peterson resided in Sioux City, Iowa at the time they filed their petitions *348 in this case. Mark R. Peterson and Susan P. Peterson (the children) are the children of Mr. and Mrs. Peterson. Union Bank and Trust Company (the trustee) is the corporate trustee of petitioner Robert L. Peterson Irrevocable Trust #1 for the benefit of Mark R. Peterson (Trust No. 1), and petitioner Robert L. Peterson Irrevocable Trust #2 for the benefit of Susan P. Peterson (Trust No. 2). The trustee's principal office was in Lincoln, Nebraska at the time it filed its petitions in this case. The Petersons filed their joint 1976 Federal income tax return (Form 1040) with the Internal Revenue Service Center in Kansas City, Missouri. They filed their respective quarterly gift tax returns (Forms 709) for the calendar quarter ending June 30, 1976, with the Internal Revenue Service Center in Ogden, Utah. The children filed their respective Federal income tax returns (Forms 1040) with the Internal Revenue Service. The trustee filed its Federal fiduciary income tax returns (Forms 1041) for the taxable year beginning April 9, 1976, and ending December 31, 1976, with the Internal Revenue Service. After graduating from high school and completing one year of college, Peterson worked for *349 several years during the late 1950's as a cattle buyer for a number of companies. In 1960, Peterson became a cattle buyer for Iowa Beef Processors, Inc. (IBP), a beef processing company that was founded by A. D. Anderson (Anderson) and Currier J. Holman (Holman) in Dennison, Iowa during the late 1950's. After working at IBP as a cattle buyer for awhile, Mr. Peterson decided to learn the "inside" of the business by working in IBP's packing plant. He started out as a superintendent in the plant, and then became a salesman. Later, he became the manager of IBP's plant in Fort Dodge, Iowa. Peterson managed that plant between six and eight months, and in 1966, he became the vice president of production and was transferred to Dakota City, Nebraska to start up IBP's Dakota City plant, one of the largest packing plants in the world. In late 1968, Peterson became group vice president of all operations of IBP. While Peterson was managing the Fort Dodge, Iowa plant, IBP acquired a pork packing plant in Perry, Iowa. After Peterson became vice president of production and after the Dakota City, Iowa plant was in operation, IBP began to acquire other plants. IBP acquired two related plants, *350 one a pork packing plant in Sioux City, Iowa, and the other a beef packing plant in Luverne, Minnesota. In late 1967 or early 1968, IBP traded the Sioux City, Iowa pork plant for beef plants in West Point, Nebraska and Emporia, Kansas. Then IBP acquired Blue Ribbon Beef Pack, Inc., which owned two beef plants (the Blue Ribbon plants), one located in LeMars, Iowa, the other in Mason City, Iowa. After IBP acquired the Blue Ribbon plants, the United States Department of Justice sued IBP, alleging that IBP violated section 7 of the Clayton Act (15 U.S.C. sec. 18) by attempting to monopolize the beef packing industry. On March 20, 1970, the United States District Court for the Northern District of Iowa entered a final judgment upon the parties' consent (the consent decree) that (1) required IBP to sell the Blue Ribbon plants and (2) enjoined IBP from acquiring the assets or stock of any organization engaged in the business of slaughtering or processing fed cattle in Iowa, Nebraska, Minnesota, or South Dakota for a period of 10 years. Later, IBP purchased packing plants in Boise, Idaho and Pascal, Washington. Shortly before the trial in this case, IBP purchased *351 packing plants in Gennicile, Illinois and Storm Lake, Iowa. Peterson was involved in all of these plant acquisitions other than the Perry, Iowa plant.His role included determining whether IBP should acquire the plants, and the price it should pay for them. By 1976, IBP was the largest meat packing company in the United States. By its fiscal year ended November 1, 1975, IBP had sales of over $1.8 billion and net earnings of over $23 million. IBP's tremendous success resulted from a number of factors.Before IBP was organized in the late 1950's, most large meat packing plants were located in big cities like Chicago, Illinois; Omaha, Nebraska; Kansas City, Missouri; Sioux City, Iowa; and Sioux Falls, Iowa. These plants had been built in the 1920's and 1930's, and were located in bigger cities because at that time refrigeration was poor and packing plants had to be close to the final destination of the product or else the meat might spoil enroute. After World War II, refrigeration and transportation improved considerably. IBP was one of the first meat packing companies to build its plants close to the supply source. The farther cattle and other meat producing animals are shipped *352 before slaughter, the more the animals "shrink," i.e., lose weight. The more the animals shrink, the less the farmers receive for them because they are paid on the basis of the animals' live weight. For these reasons, farmers preferred to sell their cattle to IBP. Because IBP had first choice of cattle and because its cattle shrank less, IBP's products graded better. IBP also had better yields from its cattle because its personnel, including management, paid more attention to detail. In addition, IBP managed to reduce its costs compared to other meat packers. Its employees lived in smaller towns where the cost of living was not as high; they were therefore willing to work for less than employees in bigger cities. IBP was also able, for the most part, to avoid unionization, which helped further reduce its labor costs. Even in its unionized plants, IBP avoided a master contract, i.e., a contract used by the union with other meat packing companies. The problem with a master contract from IBP's perspective was that if one packer capitulated to the union, then all other companies followed suit. IBP also used far more automation and made a number of innovations in its packing *353 procedures. A major innovation IBP introduced was boxing its product. Instead of shipping the whole carcass, including bone and fat, IBP cut the carcass into the usual cuts of beef, put them in bags, and then boxed them. This enabled IBP to reduce its shipping costs because it was not paying freight for bone and fat that were of no use to its customers. Shipping boxed meat rather than carcasses was also more sanitary. IBP limited its risk of loss from price fluctuations by carefully arranging its buying by wireless radio systems so that it was making bids and committing the company to purchase animals and at the same time through its telephone marketing system, it was arranging sales of the meat. In addition, Anderson, one of IBP's co-founders, was an expert in designing and constructing sanitary sewage treatment facilities for slaughter wastes, especially blood. IBP used his expertise to develop efficient, low-cost, and state-of-the-art slaughtering facilities.This helped IBP increase its profit margins. Peterson was also a key figure in IBP's rapid growth and became known as the "golden boy" at IBP. He was recognized as a "superstar" in the industry. Peterson was closely *354 associated with Holman, IBP's chairman of the board. During 1969, Peterson began to wonder whether his success was due to his own ability or due to his relationship with Holman. He began to wonder whether he could be as successful on his own. Because of these self-doubts, some problems Peterson had with Holman's management style, and a higher salary offer, in 1969, Peterson accepted an offer to become the executive vice president and chief operating officer of Spencer Foods, Inc., one of IBP's competitors, located in Spencer, Iowa. Peterson's departure from IBP was not amicable. He and Holman had been very close, and although they argued about management styles, they had remained friends. When Peterson announced he was leaving, Holman cried and asked him not to leave, but Peterson had committed himself to joining Spencer Foods, Inc. Once Holman realized that Peterson was not going to change his mind, Holman told him to get out and called him unkind names. Peterson's departure caused hard feelings between Peterson and Holman, and they were no longer friends. While Peterson was at Spencer Foods, Inc., Holman used his influence to try to block industrial development bond financing *355 that Spencer Foods, Inc., was seeking. Peterson reminded Holman that Peterson knew IBP from the inside and that if Holman persisted in trying to hurt Spencer Foods, Inc., Peterson would use that inside information to hurt IBP. After this, Holman backed off and Spencer Foods, Inc., was able to get the financing. Peterson worked at Spencer Foods, Inc., from 1969 until 1971. He left to form a new company, Madison Foods, Inc., (Madison) with two other former IBP executives, Anderson and Walter E. Lauridsen (Lauridsen). Anderson had been the co-founder and president of IBP. He left IBP after Peterson did because of his difficulties with Holman and some physical problems. Anderson's departure from IBP was far more bitter than Peterson's because Anderson and Holman had co-founded IBP and had been very close. Lauridsen had been vice-president of engineering at IBP. He left IBP before Peterson did because he too had had difficulties with Holman, and also because he had become very wealthy by selling the Perry, Iowa pork plant to IBP for IBP stock. Lauridsen had signed a five-year employment contract with IBP when he sold the plant to IBP. After his contract expired, he decided to *356 retire because of his problems with Holman and because his IBP stock had appreciated substantially so that he could afford to retire. However, he decided to get back into business, and kept asking Peterson to go into the pork business with him. Thus, on November 30, 1971, Peterson, Anderson, and Lauridsen (the Madison principals) organized Madison to construct and operate a pork packing plant in Madison, Nebraska. Peterson was the president and chief executive officer, Lauridsen was chairman of the board and treasurer, and Anderson was vice president and secretary. Peterson and Lauridsen each purchased 166,667 shares and Anderson purchased 166,666 shares of Madison common stock with a par value of $1 per share (Madison stock) for $1 per share. The Madison principals hoped to take this $500,000 capital contribution, obtain additional financing, and build a pork packing plant. The Madison principals did not think it was economically feasible for them to establish a full-blown pork processing operation, so they decided to enter into a custom slaughtering contract with a major pork company. The pork industry was then dominated by four big national packers, Swift, Armour, Cudahy, *357 and Wilson, and three somewhat smaller national packers, Hormel, Oscar Mayer, and Morrell. These national packers had extensive buying and selling operations. Hog farmers took their hogs to buying stations that were located near the farms about 20 miles apart, but were owned and operated by the packers.At the buying stations, a farmer's hogs were unloaded, weighed, put into pens, and then, after being purchased by the packer, were hauled to the packing plant. During 1971, it cost about $40,000 to set up one buying station. The national, as well as other packers, sold pork primarily as branded products, that is, under the company's name. It took a great deal of money for a company to establish and maintain public acceptance of its brand. Madison could not raise enough money to set up a sufficient number of buying stations, provide itself with sufficient operating capital to buy hogs, and establish its own brand, in addition to building a plant.Therefore, the Madison principals decided to build a plant and enter into a custom slaughtering arrangement with a major pork company. In such an arrangement, the major pork company buys the hogs and transports them to the processing company's *358 plant. The processing company unloads, slaughters, and processes the hogs. It then packages the final product in the major pork company's packaging and loads it into the major pork company's trucks. The major pork company then transports and sells the finished product. Under such an arrangement, the processing company needs only enough operating capital to meet its payroll. In late 1971 or early 1972, Madison began negotiating a custom pork slaughtering arrangement with Armour and Company (Armour). These negotiations resulted in an agreement dated as of March 16, 1972 (the Armour custom contract), whereby Armour and Madison agreed that Armour would provide Madison with hogs and Madison would process them. On the same date, Armour and the Madison principals entered into an agreement (the Armour first refusal contract) in which the Madison principals agreed that before transferring any of their Madison stock, they would first offer the stock to Armour as provided therein. The Armour first refusal contract excepted from its restrictions any Madison principal's transfer of Madison stock to a trustee for the benefit of himself, his spouse, or his lawful issue, provided that the *359 trustee be subject to the same restrictions. By an agreement dated March 28, 1973 (the Madison stock restriction agreement), Madison, the Madison principals, Frances C. Lauridsen, individually and as trustee, and The Toy National Bank, as trustee, agreed that for the duration of the Armour custom contract, none of the stockholder-parties would sell any of their Madison stock if such sale would reduce any of the Madison principals' beneficial ownership of Madison stock below 134,300 shares. By its terms, the Armour custom contract was not operative until after construction of Madison's pork packing plant was completed. In pursuance of its obligation under the Armour custom contract, Madison acquired interim construction financing and, during June of 1972, began constructing its pork packing plant. The Madison principals determined that Madison would need a total of about $8.5 million to construct its plant and commence operations. They estimated the total cost of construction to be about $7.4 million. The Madison principals went to First Mid America, Inc. (FMA), an investment banking corporation with its principal office in Lincoln, Nebraska, to help them raise the remaining *360 $8 million in permanent capital Madison needed ($8.5 million total capital less $500,000 the Madison principals collectively paid for their Madison stock). FMA had been involved in IBP's financing almost since its inception, and the Madison principals had all worked at IBP and were therefore familiar with FMA. FMA also knew the Madison principals, and FMA was hired to locate bankers or institutional lenders that might be willing to invest in Madison. Madison was unable to obtain institutional financing for the full amount of capital it needed. By a letter agreement dated March 21, 1973 (the Prudential loan agreement), the Prudential Insurance Company of America (Prudential) agreed to take Madison's promissory note (Madison's note) in the amount of up to $4.25 million and 10-year warrants to purchase between 55,000 and 65,000 shares of Madison common stock at an exercise price of $3.00 per share. The Prudential loan agreement conditioned Prudential's obligations thereunder upon completion of Madison's plant and the consummation of a public offering of investment units in Madison. By a prospectus dated April 18, 1973, Madison offered to the public 3,000 investment units therein. *361 Each unit consisted of $1,000 principal amount of subordinated debentures with attached warrants to purchase 50 shares of Madison common stock (at prices from $2 to $7.50 per share over a period of time) and with 25 shares of Madison stock. The $1,000 sales price of each investment unit was allocated $975 to the debentures with warrants attached, and $25 to the 25 shares of Madison stock. Thus, in effect, the 25 shares of Madison common stock per investment unit sold for $1 per share. [5] The public offering completely sold out. Madison financed the construction of its sewage treatment facilities through tax-exempt financing by means of a sanitary and improvement district (a municipal corporation), which issued bonds in the total principal amount of about $1 million for such purpose. *362 On March 25, 1974, construction of Madison's plant was, for all practical purposes, completed. The Armour custom contract went into effect, and Madison commenced operations. While Madison's plant was being constructed, in late 1972, Peterson met with Donald H. Bowman (Bowman), an attorney in Lincoln, Nebraska, to have some estate planning work performed. Peterson was introduced to Bowman by Richard Peterson (no relationship to Peterson), one of Bowman's partners who represented Madison. As a stop-gap measure, Bowman drafted wills for Peterson and his wife and a life insurance trust agreement containing a standard marital deduction formula. Those documents were executed in the early part of 1973. After that, Peterson requested Bowman to review his entire estate and to make further recommendations. After reviewing Peterson's financial situation and discussing it with Peterson, Bowman recommended that Peterson establish custodial accounts and irrevocable trusts for his children, and make gifts of his Madison stock to his children through those vehicles. Bowman suggested gifts of Madison stock because that was the major asset in Peterson's estate and the stock had potential *363 for appreciation. As originally executed, paragraph 23(c) of the Armour custom contract gave Armour the right to terminate the contract if, at any time during its term, the Madison principals together beneficially owned less than a majority of outstanding Madison stock. By an addendum dated January 5, 1973, Madison and Armour amended paragraph 23(c) of the Armour custom contract to make it clear that for purposes of determining their ownership of Madison stock, each Madison principal was to be treated as owning any Madison stock held by his spouse, his lawful issue, or any trust for the benefit of any such persons or the Madison principal (a related party). [6] The addendum also amended paragraph 23(c) to give Armour the right to terminate the Armour custom contract if, at any time, any Madison principal owned less than 17 percent of the outstanding Madison stock. The Prudential loan agreement gave Prudential the right to accelerate payment of Madison's note if at any time any Madison principal owned less than 17 percent of the outstanding Madison stock. The agreement provided, however, that each Madison principal was to be treated as owning Madison stock held by his related parties. *364 Peterson specifically negotiated the amendment to the Armour custom contract and the similar provision in the Prudential loan agreement because of the recommendations he received from Bowman to give a portion of his Madison stock to his children. In early or mid-1975, Peterson decided to give some of his Madison stock to his children through custodial accounts and irrevocable trusts. At that time, Peterson asked Bowman to prepare the necessary documents to make the gifts, and Bowman began drafting them. On or about July 18, 1975, Madison issued an additional 200 shares of its stock (in addition to his 166,667 shares) to Peterson as custodian for his children under the Nebraska Uniform Gifts to Minors Act. Bowman mailed drafts of the irrevocable trust agreements to Peterson. Thereafter, they met a couple of times in Madison, Nebraska, and more than once in Bowman's office in Lincoln, Nebraska, and corresponded back and forth regarding changes in the agreements that Peterson wanted. Bowman redrafted the agreements a number of times. Peterson wanted to make sure *365 he understood what would happen under the trust agreements in various circumstances. He was also adamant about understanding each power granted to the trustee. It took Bowman quite some time to convince Peterson that he could retain no control over the corpus if the trusts were to be irrevocable. Peterson and Bowman also discussed at length who would serve as trustee. Completion of the trust agreements dragged on because Peterson was busy running Madison, Peterson and Bowman were in different cities, and neither of them considered completion of the agreements urgent. In addition, Peterson could not tell Bowman how many shares of Madison stock he intended to give his children because he first had to determine how much gift tax would be due on the gifts and how the gift tax would be paid. Peterson intended to make net gifts of his Madison stock, that is, have the donees pay the gift tax. He originally hoped that the donees could sell some of the Madison stock to pay the tax. Peterson and Bowman discussed this possibility with FMA, which was the only firm making a market in Madison stock. FMA suggested that the donees not sell any Madison stock. FMA was concerned that the investing *366 public might view a sale of Peterson's Madison stock as an indication that he was bailing out of Madison. FMA considered this very troubling because the public offering prospectus indicated that Madison's success was heavily dependent upon Peterson. FMA also told Peterson that his donees would probably only be able to sell the stock for about $2 to $3 per share. Because of these problems, Peterson decided to fund the gift tax payments by borrowing money and lending it to the donees. Using the amount of money he could borrow to pay the tax as his guide, Peterson decided to give 50,000 shares of his Madison stock to his children and to trusts for their benefit. However, Peterson delayed the gifts because he knew he was going to have to borrow this money. About the time the Madison plant was completed, in early 1974, Holman, IBP's chairman, asked Peterson if he would "come back home," that is, return to work for IBP. After discussing the offer with Holman, Peterson declined because he was happy at Madison. Peterson believed that Madison was going to be very successful and he was not interested in returning to "the big corporate life." At that time, Holman and Peterson did not discuss *367 IBP's acquiring Madison. Several months later, in the latter part of 1974, Holman contacted Peterson to discuss IBP's acquiring Madison. Holman offered for IBP to acquire Madison for $13 million, which represented about $4 million to Madison's stockholders and about $9 million to liquidate Madison's outstanding long-term debt (the publicly held subordinated debentures, Madison's note to Prudential, and the sanitary and improvement district bonds). Peterson was not interested in rejoining IBP at that time. He had had difficulties with Holman in the past. Also Madison was becoming more successful, and IBP was having serious difficulties. Madison was in the middle of negotiating the construction of a ham canning plant for Armour. He also enjoyed the entrepreneurial freedom Madison provided. Peterson rejected Holman's offer. Holman lost interest in further pursuing negotiations in late 1974 because he become preoccupied with a criminal bribery case in New York City in which he and IBP were defendants. On October 7, 1974, Holman and IBP were found guilty by a New York State Supreme Court on state misdemeanor charges of conspiracy to bribe supermarket meat buyers and labor union *368 officials. Holman was unconditionally discharged on both counts, and IBP was fined a total of $7,000 on the two counts of the indictment. Holman and IBP filed an appeal from the convictions before the Appellate Division of the New York State Supreme Court. Their appeal was denied without opinion on September 30, 1975. Their petition for leave to appeal to the New York Court of Appeals was also denied. Federal charges against Holman, which alleged using the facilities of interstate commerce to violate New York conspiracy laws, had been dropped on November 26, 1974. The criminal prosecution of Holman and IBP was widely reported locally in the mid-west, nationally, and internationally. During the trial, Holman spent so much time in New York that he rented an apartment there. In August or September of 1975, Holman again approached Peterson about IBP's acquiring Madison. Negotiations broke off in late November of 1975 due to Holman's preoccupation with the IBP management matters. IBP had hired Walter Bodenstein (Bodenstein) to replace its executive vice president and chief operating officer, Leroy S. Zider, who had recently resigned. Bodenstein was the non-in-law of a reputed *369 organized crime figure who was intimately insolved in the conspiracy to bribe charges that were brought against Holman and IBP. IBP's hiring of Bodenstein was widely reported locally in the mid-west, nationally, and internationally. A number of newspaper articles about the hiring implied that it evidenced a connection between IBP and organized crime. An article published in the Wall Street Journal suggested that the hiring imperiled IBP's $60 million line of credit with a group of New York City banks led by First National City Bank. The New York Stock Exchange suspended trading in IBP stock for a brief period to permit dissemination of correct information in regard to IBP. Within two weeks of his hiring, Bodenstein either resigned or was released by IBP, and returned to New York City. By December of 1975, IBP was desperately in need of good top management. Its chief operating officer and executive vice president, the number two man, Leroy S. Zider, had recently resigned. His replacement, Bodenstein, lasted only about two weeks. IBP had recently lost its co-chairman, J. Robert Kemp. A number of other individuals in IBP's management had also left. IBP's president, J. Fred *370 Haigler (Haigler), was 65 or 66 years old and had publicly announced his desire to retire. Holman himself was also 65 or 66 years old. At this time, Holman was a very troubled man. He feared for his life. During the conspiracy to bribe trial, he had made some harsh comments about organized crime. After the trial, Holman received anonymous phone calls stating that he was on a hit list, and that "they were going to get him." Due to these events, IBP was not as well managed as in the past. This greatly troubled Holman, because he loved IBP, often referring to it as "home." He had co-founded IBP and had been its principal decision maker throughout the years. In December of 1975, Holman renewed negotiations to acquire Madison so that Peterson would return to IBP's top management.Holman had only slight interest in acquiring Madison's pork packing plant to enter the pork business. However, everyone involved in the negotiations cearly understood that Holman's primary purpose was to acquire Peterson's management services for IBP. Because of this strong desire, Holman offered for IBP to acquire Madison for about $18.3 million, about $9 million to liquidate Madison's debt and about *371 $9 million to Madison stockholders. This was $5 million more than his prior offer, and represented $1 million more to Peterson for his stock. The Madison principals and some IBP executives viewed this offer as substantially greater than the value of Madison's assets, primarily its pork packing plant. Because the offer included such a premium, being about triple the market value of Madison's assets, the Madison principals were very willing to cash out their equity in the business. IBP was willing to pay such a premium in order to obtain Peterson's services. IBP executives considered him "worth every penny." By an addendum dated January 25, 1976, the parties to the Madison stock restriction agreement amended it by inserting a paragraph allowing them to accept IBP's offer to purchase their Madison stock. By a sale and purchase agreement dated January 26, 1976 (the stock purchase agreement), the Madison principals agreed to sell their 500,200 shares of Madison stock to IBP for the aggregate price of $6,502,600, representing $13 per share as follows: Shares of
Madison Stockholder
Madison Stock Owned
A. D. Anderson
166,666
Robert L. Peterson
166,667
Walter E. Lauridsen
50,000 Frances C. Lauridsen, individually
24,667 Frances C. Lauridsen, as Trustee
for S. Kim Lauridsen, Nixon E.
Lauridsen and Hans O. Lauridsen
69,500 The Toy National Bank, as Trustee
for Joanne Lauridsen
22,500 Robert L. Peterson, as Custodian
for Mark R. Peterson and Susan
P. Peterson
200    *372 The stock purchase agreement forbade any party thereto from assigning any right, interest, or obligation thereunder without the prior written consent of the other parties. The agreement provided that the sale and purchase would close no later than 179 days after the expiration of the 60-day period in which Armour had to exercise its right of first refusal. The stock purchase agreement contained a lengthy list of representations and warranties made by the Madison principals. It also contained a list of conditions to IBP's obligation to purchase the Madison stock. One such condition was that at IBP's option Peterson execute and deliver to IBP a 10-year employment contract, a copy of which was attached to the stock purchase agreement. Peterson's legal counsel advised him not to execute the employment contract with IBP before the closing because Madison's public stockholders might claim that Peterson was receiving a greater purchase price for his Madison stock than they were. Peterson suggested that he did not really want to return to IBP, and that he preferred to sell Madison to IBP, start another new company, and "do it again." However, Peterson knew that the whole purpose of *373 the sale was for IBP to obtain his services. Before IBP eventually acquired Madison, Peterson made no written commitment to work for IBP and did not execute the employment agreement. He did, however, agree to be reasonable in discussing employment with IBP after the closing. Holman and Peterson had known each other for a long time, and they proceeded on good faith and trust. However, the lack of a written employment contract deeply concerned Holman. He was worried that Peterson might be arbitrary in negotiating after the closing and that Holman's primary purpose, acquiring Peterson's services, would not be accomplished. Holman constantly visited and phoned Peterson day and night to discuss what Peterson would do after the closing and how involved he would be in IBP's management. Holman tried to use the acquisition as leverage in that if Peterson did not make Holman comfortable enough about the employment situation, Holman would kill the deal. Holman himself, however, did not want Peterson to sign any written employment contract before the closing. Under the Armour first refusal contract, Armour had the right to purchase the Madison principals' stock upon the same terms and *374 conditions as any proposed purchaser. Thus, if Peterson signed an employment contract with IBP before the closing, Armour could exercise its right of first refusal and purchase the Madison principals' stock upon the same terms as IBP, including the terms of any employment contract between Peterson and IBP. Thus, while Holman wanted to make sure before the closing that Peterson would work for IBP afterward, he could not obligate Peterson to do so without risking Armour's exercising its right of first refusal and requiring Peterson to work for Armour. If Peterson had indicated before the closing that he would not join IBP thereafter, Holman would have killed the deal. Neither Holman nor any other member of IBP's management was particularly interested in IBP's reentering the pork business. IBP had previously owned two pork packing plants and disposed of them after a short period because they were unprofitable. Holman did not have much experience in the pork business, and therefore was not very knowledgeable about it.In addition, Madison's plant was on a master union contract. Holman was afraid that acquiring a lant on a master contract might cause IBP's other plants to end up *375 on master contracts. Holman really hoped that Armour would exercise its right of first refusal to purchase the Madison principals' stock and that Peterson would then return to work for IBP. In addition to its right of first refusal, under the Armour custom contract, as amended by the addendum dated January 5, 1973, Armour had the right to cancel the contract if any Madison principal beneficially owned less than 17 percent of the outstanding Madison stock. Like Madison, IBP had no hog buying operation (buying stations and buyers) or sales organization (a brand name and a sales force). Without the Armour custom contract, IBP could not operate Madison's plant until it either entered into a similar arrangement with another pork company or established a buying operation and a sales organization, which would take about 1-1/2 years and a substantial amount of money. Peterson thought that Armour's termination of the Armour custom contract might violate paragraph 7(c) of the stock purchase agreement, which conditioned IBP's obligations thereunder upon the absence of any material adverse change in Madison's business, operations, and financial condition. However, Armour could not terminate *376 the Armour custom contract until after the Madison principals sold their stock. The stock purchase agreement conditioned IBP's obligations thereunder upon the absence of any material adverse change in Madison's business, operations, and financial condition before the closing.
Similar to the Armour custom contract, the Prudential loan agreement gave Prudential the right to demand payment of Madison's note if any Madison principal beneficially owned less than 17 percent of the outstanding Madison stock. In addition, Prudential could demand payment if Armour terminated the Armour custom contract. IBP was concerned that Prudential might demand payment of the Madison note after the closing. IBP was in a somewhat uncertain financial situation at the time, having just come out of the Bodenstein situation in which there had been some intimations, but no real threats, that IBP's line of credit was in jeopardy. If Prudential demanded payment, IBP would have to use part of its operating line of credit to pay Madison's note. Therefore, Holman hoped Prudential would not demand payment. Peterson thought that Prudential's demanding payment might violate paragraph 7(c) of the stock purchase *377 agreement, which conditioned IBP's obligations thereunder upon the absence of any materially adverse change in Madison's business, operations, and financial condition. As with Armour's right to terminate the Armour custom contract, Prudential could not demand payment of Madison's note until after the Madison principals sold their stock. As noted above, the stock purchase agreement conditioned IBP's obligations thereunder upon the absence of any material adverse change in Madison's business, operations, and financial condition before the closing.
Paragraph 7(g) of the stock purchase agreement conditioned IBP's obligations thereunder upon its obtaining, by virtue of the agreement and a tender offer for publicly held Madison stock, the right to acquire at least 85 percent of outstanding Madison stock. For this purpose, each outstanding warrant to urchase one share of Madison stock (a Madison warrant) was treated as a share of outstanding Madison stock. [7] Paragraph 5 of the stock purchase agreement obligated IBP to make a tender offer (the tender offer) to acquire the publicly held Madison stock for $13 per share, and outstanding Madison warrants at $13 per warrant, less the *378 exercise price. The agreement required IBP to make the tender offer within 30 days after Armour declined to exercise or allowed to expire its right of first refusal. If at least 85 percent of the outstanding Madison stock was tendered (including the Madison principals' stock), IBP was obligated to purchase all stock tendered. If less than 85 percent was tendered, IBP was not obligated to buy any Madison stock, but could elect to buy the stock tendered. Madison had over 460 stockholders and 330 warrant holders. It had 628,725 shares and 161,275 warrants, for a total of 790,000 shares and warrants outstanding. The Madison principals owned 500,200 shares or 63.3 percent of the outstanding Madison stock and warrants. Prudential owned 65,000 of the outstanding warrants. The other Madison stock (that was not held by the Madison principals and Prudential) was held primarily in small blocks by local farmers. Neither Madison nor the Madison principals had any control over whether such stockholders and warrant holders would tender *379 their stock and/or warrants. One of the principal reasons Holman insisted that IBP's obligations under the stock purchase agreement be conditioned upon IBP's ability to acquire at least 85 percent of the outstanding Madison stock was that if a large number of the public stockholders of Madison tendered, he thought that various government regulatory agencies might be less likely to challenge the transaction. Since 1973, IBP had been investigated by a number of Federal regulatory agencies, including the United States Department of Agriculture, the Packers and Stockyards Administration, the Federal Trade Commission, and the antitrust division of the United States Department of Justice. These agencies had, on various occasions, alleged that IBP was too large and that it was monopolizing the beef packing industry. IBP was also subject to a consent decree enjoining it from acquiring beef packing plants in certain states. IBP was concerned that the Justice Department might argue that the consent decree prohibited IBP from acquiring a pork packing plant as well, or that the acquisition might violate section 7 of the Clayton Act (15 U.S.C. sec. 18) on the theory *380 that IBP was using its power in one market to enter another. IBP thought that such an argument was possible but not highly probable. The Madison principals were much more worried than IBP about governmental interference with the acquisition. Their concern was that if Armour cancelled the Armour custom contract and Prudential demanded payment of Madison's note, and then a government agency interfered with the acquisition, Madison would be left with no deal, no financing, and no operation. Because of this concern, Peterson negotiated into the stock purchase agreement a provision addressing the consequences of a governmental challenge to the acquisition. The provision first stated that IBP's obligations under the stock purchase agreement were not conditioned upon the absence of such a challenge. It also provided that if the government challenged the acquisition, IBP would take all steps necessary and legally permissible to ensure that the Madison principals and other tendering Madison stockholders received the stated purchase price for their stock. By way of example, the provision suggested that if the transaction was challenged, IBP could pay the purchase money into a trust, the *381 trustee of which would be authorized to receive tendered Madison stock, to pay out the purchase money to the Madison principals and tendering stockholders, and to hold the tendered stock pending resolution of the challenge while operating Madison for IBP's benefit. By a letter dated January 30, 1976, Matthew E. Jaffe, a Justice Department antitrust attorney, requested that Edward W. Rothe, IBP's counsel, explain why IBP's acquisition of Madison "does not fall within the prohibition in Paragraph V of the March 20, 1970 consent decree," which enjoined IBP from acquiring the assets or stock of any organization engaged in the business of slaughtering or processing fed cattle in certain states. Rothe responded by a letter dated February 12, 1976, informing Jaffe that the acquisition was not within the consent decree's prohibition because Madison's only business was slaughtering and processing hogs under the Armour custom contract. Paragraph 7(f) of the stock purchase agreement conditioned IBP's obligations thereunder upon IBP's receipt of assurances that the stock purchase would not cause the revocation, termination, or suspension of any license or permit held by Madison to produce, *382 distribute, or sell any of its products or services. Madison's wholly owned subsidiary, Madison Lines, Inc. (the trucking subsidiary), held a permit issued by the Interstate Commerce Commission (the ICC) authorizing it to transport meats and packing house products from Madison's plant to points in the 48 contiguous states. The trucking subsidiary delivered Madison's output on Armour's behalf. Because of its ICC permit, IBP considered the trucking subsidiary a very valuable asset. Peterson estimated the permit's value at upwards of $1 million. IBP also owned and operated an ICC regulated carrier called Process Beef Express. However, it did not have authority to transport refrigerated meats in as many states as the Madison trucking subsidiary. Section 5 of the Interstate Commerce Act (49 U.S.C. sec. 5) prohibits ne regulated carrier from acquiring another without advanced permission from the ICC. The parties to the stock purchase agreement knew that they could not obtain ICC permission before the proposed closing date, and, therefore, that paragraph 7(f) of the stock purchase agreement would not be satisfied regarding the trucking subsidiary's permit. FMA *383 was the only market maker in Madison stock after Madison's public offering in May of 1973. FMA had been involved with both IBP and Madison since their inception. FMA arranged financing for, conducted extensive research on, and generally followed both corporations. On January 12, 1976, FMA learned that IBP and Madison were negotiating the stock purchase agreement and stopped trading Madison stock because it did not have enough information to quote the market. FMA withdrew from the market because of the substantial uncertainties at that time surrounding the eventual consummation of the acquisition. That was uncommon for FMA because usually it would take a measured risk. FMA also decided not to arbitrage the transaction. An arbitrage is an attempt to profit by buying stock before an announced transaction is consummmated at a price less than the price at which the stock will ultimately be sold for if the acquisition is consummated. Usually, after information regarding the stock purchase agreement had been disseminated to the public, FMA would have resumed trading in Madison stock. However, FMA considered the transaction so difficult to evaluate that it did not resume trading or *384 attempt to arbitrage Madison stock. FMA's decision to not arbitrage the transaction was not unusual, however, because it seldom arbitraged acquisitions. No one else arbitraged the transaction. This was somewhat unusual, although the relatively small size of the transaction and the historically thin trading in Madison stock lessened the likelihood of arbitrage activity. On January 12, 1976, the last date prices were quoted by FMA for Madison stock, the reported bid price was $4.50 per share. [8]
On March 24, 1976, Armour declined to exercise its right of first refusal. The stock purchase agreement required IBP to make the tender offer within 30 days thereafter. On April 7, 1976, IBP made the tender offer. IBP offered to pay $13 per share of Madison stock, $9.50 per outstanding publicly *385 held warrant, and $10 per outstanding privately held warrant (Prudential's warrants), the latter figures being the $13 per share less the respective exercise price for the warrants. IBP sent Madison stockholders a document (the tender offer document) describing the terms of the tender offer and other relevant information. The document specifically noted that IBP's obligations to consummate the stock purchase agreement and the tender offer were subject to the cnditions that: (1) The Madison principals' representations and warranties in the stock purchase agreement are true and complete as of the closing and they comply with the agreement's terms. (2) IBP receive an opinion of Madison's counsel as required by the stock purchase agreement. (3) There is no material adverse change in Madison's business, operations, or financial condition. (4) No material litigation is pending or threatened against Madison or the Madison principals. (5) IBP is assured that consummation of the stock purchase agreement and the tender offer will not cause a termination of any of Madison's licenses or permits. (6) IBP obtain, by virtue of the stock purchase agreement and the tender offer, the *386 right to acquire at least 85 percent of the outstanding Madison stock. The tender offer document stated that if less than 85 percent of the outstanding Madison stock was tendered, IBP might but was not obligated to purchase all Madison stock tendered.The document stated as follows regarding IBP's intentions: IBP hopes, through the Agreement and this Offer, to acquire all of the shares and warrants. If IBP acquires less than all such securities, IBP presently intends to cause the merger of Madison with IBP or a wholly owned subsidiary of IBP for the purpose of eliminating any minority interest in Madison. IBP anticipates that the terms of such merger will provide for the payment of cash, in the amounts quoted in this Offer, to any remaining shareholders or warrant holders of Madison. * * * If IBP acquires more than 80% of the outstanding shares through this Offer, it may accomplish such merger through the provisions of the Nebraska Business Corporation Act permitting a so-called "short-form" merger. These provisions permit the merger of an 80%-or-more owned subsidiary by action of the board of directors of the parent corporation. If as a result of this Offer IBP does not *387 acquire sufficient shares to permit it to avail itself of these provisions, IBP may seek to acquire additional shares through market or private transactions in order to enable it to do so. * * * The tender offer document did not disclose or in any way indicate that IBP's obligations under the stock purchase agreement were conditioned upon, at IBP's option, Peterson's executing and delivering to IBP a 10-year employment contract. The document did, however, note that IBP had offered to employ Peterson and that as of the date of the document, Peterson had neither accepted nor rejected the offer but had indicated a willingness to enter into negotiations with IBP if the stock purchase agreement and tender offer were consummated. The tender offer document described the impact of the acquisition on the Armour custom contract and the Prudential loan agreement as follows: If the Agreement and this Offer are consummated, Armour has the right, upon 30 days' notice, to cancel * * * [the Armour custom] contract. As of the date hereof Armour has given no indication that it presently intends to exercise this right but there can be no assurance that it will elect to continue the contract. *388 In the event Armour does elect to exercise its right to cancel the contract, IBP intends to operate Madison's facility for its own account. Madison would then become subject to the risks of purchasing live animals and marketing the finished product, which risks are presently assumed by Armour and Company. At present neither IBP nor Madison has its own hog purchasing or pork marketing personnel. Such personnel would have to be secured in order to so operate the facility. * * * On March 24, 1976, Armour and Company declined to exercise its right of first refusal to match IBP's offer to purchase Madison securities. Under the terms of * * * [the Prudential loan] agreement * * *, Prudential may elect to demand the payment of the princial balance ($3,775,000 as of March 26, 1976) and accrued interest outstanding under Madison's first mortgage note if the Principals shall, during their lifetimes, at any time each own less than 17% of the common stock of Madison. The consummation of the transactions contemplated in the Agreement and this Offer would give Prudential the right to so elect. * * * [The Prudential loan] agreement also gives Prudential the right to demand the payment *389 of the principal balance and accrued interest of the first mortgage note if the custom slaughter agreement with Armour is terminated. The consummation of the transactions contemplated in the Agreement and this Offer will, as noted above, give Armour the right to terminate such custom slaughter agreement. If Prudential elects to demand payment of the note, IBP intends to pay the note out of available corporate funds. [Emphasis supplied.] FMA helped prepare the tender offer document and acted as solicitation agent for the tender offer.No Madison stock was tendered to IBP between April 7 and April 9, 1976. On April 9, 1976, two days after IBP made the tender offer, Peterson and the trustee entered into irrevocable trust agreements creating Trust No. 1 and Trust No. 2.On or about the same date, Peterson gave the following Madison stock to the indicated donee: [9]
Donee
Number of Shares
Mrs. Peterson, Custodian for
Mark R. Peterson
5,500 Mrs. Peterson, Custodian for
Susan P. Peterson
5,500 The trustee under
Trust No. 1
19,500
The trustee under
Trust No. 2
19,500
Total
50,000
Peterson made the gifts subject to the condition that the donees *390 pay the gift taxes resulting therefrom. There were no understandings or agreements between Peterson and the donees that the Madison stock would be returned to Peterson. As of the date of the gifts, Madison's equity capitalization was as follows: Madison stock outstanding
628,725
Privately held (Prudential's)
warrants outstanding
65,000
Publicly held warrants outstanding
96,275
Total
790,000
Thus, the 50,000 shares of Madison stock Peterson gave to his children and the trusts were about 6.33 percent of the total outstanding stock and warrants. The 50,000 shares were not registered with the Securities and Exchange Commission. In late April, Holman sent Peterson to Phoenix, Arizona, to *391 speak with Armour's top management about continuing the Armour custom contract after the acquisition. Peterson met with the president and chief executive officer of Armour, Al Drain (Drain). Drain indicated that Armour was not particularly interested in doing business with IBP. In the past, IBP had operated a plant under a custom slaughter agreement with Armour and had sold the plant to one of Armour's competitors without first notifying Armour. Holman had also publicly ridiculed Armour's management over another transaction. Drain told Peterson that Armour was, however, pleased with Madison's operations thus far, and that if Peterson went with IBP and continued to run the Madison plant, Armour would not cancel the contract. Drain warned Peterson that if the Madison plant operation was changed and was run in what he regarded as typical IBP style, Armour would cancel the contract. Perterson told Drain that he had no employment contract with IBP at that time, but intended to sit down and be reasonable in negotiating with IBP. Peterson reported his conversations with Drain to Holman. Shortly after meeting with Armour, at Holman's request, Peterson met with Prudential representatives *392 to discuss whether Prudential would demand payment of Madison's note because of the acquisition. They told Peterson that Prudential would not demand payment as long as Armour did not cancel the Armour custom contract. Peterson also reported this discussion to Holman. By April 28, 1976, at least 85 percent of the outstanding Madison stock (including the Madison principals' stock) had been tendered. On May 3, 1976, IBP entered into a voting trust agreement with D. Douglas Titus, whereby IBP assigned to Titus as voting trustee, all of the right, title, and interest in the trucking subsidiary's stock that IBP would obtain through the acquisition. The purpose of the agreement was to prevent IBP from acquiring direct control of the trucking subsidiary through its acquisition of Madison until ICC approval was obtained. The ICC had not approved this transaction as of the closing date. On May 4, 1976, the stock purchase closed pursuant to the agreement of January 26, 1976. At the closing, the following persons sold the indicated Madison stock to IBP: [10]
Seller
Number of Shares
Robert L. Peterson
116,667
Mrs. Peterson,
Custodian for Mark R.
Peterson
5,500  Mrs. Peterson,
Custodian for Susan P.
Peterson
5,500  The trustee under Trust No. 1
19,500 The trustee under Trust No. 2
19,500 Peterson, Custodian for
Mark R. Peterson and Susan P.
Peterson
200    A. D. Anderson
166,666
Walter E. Lauridsen
50,000 Frances C. Lauridsen, individually
24,667 Frances C. Lauridsen, Trustee
69,500 Toy National Bank, Trustee
22,500 TOTAL
500,200
*393 At no time during the period between the execution of the stock purchase agreement and the closing did IBP exercise any control over Madison's operations. On May 6, 1976, two days after the closing, Peterson and Holman signed a contract providing that Peterson would work for IBP for 10 years. The record does not indicate that the employment contract executed at that time differed in any way from the draft employment contract attached to the stock purchase agreement of January 26, 1976; the record does not establish that there was any other employment agreement, written or oral, except that one. [11]
*394 By an order dated June 28, 1976, an ICC review board denied IBP's application under section 5 of the Interstate Commerce Act (49 U.S.C. sec. 5) to acquire control of the trucking subsidiary. IBP appealed the order and continued proceedings before the ICC for over a year. The ICC eventually reversed its initial decision and approved the voting trust arrangement. The trucking subsidiary continued to operate despite IBP's acquisition of Madison and the ICC's initial denial of IBP's application. In February of 1977, Holman died. After Holman's death, Haigler, IBP's president, asked Peterson to take the presidency. Haigler wanted to retire and did not want to continue to be IBP's chief executive officer. In July of 1977, Peterson agreed to be IBP's president. At the time of trial, Peterson was IBP's chairman and chief executive officer. On the Schedule D attached to their 1976 joint Federal income tax return, the Petersons reported $1,400,004 [12] in long-term capital gain from Peterson's sale of 116,667 shares of Madison stock. They did not report any gain from the sale of the 50,000 shares of Madison stock Peterson gave to the children and to the trusts. *395 On the Schedule D attached to their respective 1976 Federal income tax returns, each of the children reported long-term capital gain in the amount of $64,074 [13] from the sale of 5,500 shares of Madison stock. On the Schedule D attached to each 1976 fiduciary income tax return it filed as trustee of the trusts, the trustee reported long-term capital gain in the amount of $227,174 [14] from the sale of 19,500 shares of Madison stock. [15]
On the Schedule A's attached to their respective Federal gift tax returns for the calendar quarter ending June 30, 1976, Peterson and his wife each reported one-half of Peterson's gifts. In accordance with the condition subject to which the gifts were made, the donees paid gift taxes *396 in the gifts in the aggregate amount of $17,504. The tax due was based upon the valuation of Madison stock at $4.50 per share. An attachment to Peterson's gift tax return recited that trading in Madison stock ceased on January 26, 1976, [16] and that the bid price for Madison stock on that date was $4.50 per share. the attachment went on to state that "in accordance with Reg. § 25.2512-2, the last bid price * * * was determined to represent the fair market value of the * * * [Madison stock] on the date of the gift." In reporting the gifts at this value, Peterson relied on advice he received from his estate planning legal counsel, his financial advisors at FMA, the only market maker in Madison stock, and the accountant who prepared his returns. [17] Neither the Petersons' gift tax returns nor the Schedule A's attached to them disclose the existence of the stock purchase agreement. However, copies of the trust agreements were attached to Peterson's gift tax return. Paragraph 13 of those agreements, appearing on page 7 of the agreements and on the 12th and 26th pages of the return and attachments, states that "[t]he Trustee further agrees to be bound by and perform under the terms *397 and provisions of * * * * [the stock purchase agreement], and further agrees that the 19,500 shares of capital stock * * * transferred to the Trustee by the Grantor shall be subject to said agreement." *398 In a statutory notice of deficiency to the Petersons dated September 4, 1981, respondent included in their income for 1976 long-term capital gain in the amount of $600,000 from the sale of the 50,000 shares of Madison stock that Peterson gave to the children and the trusts. The statutory period of limitations for assessment of any gift tax deficiency and addition thereto for the Petersons for the calendar quarter ended June 30, 1976, expired August 15, 1979, without respondent issuing a notice of deficiency of either of them. Secs. 6075(b)(1), 6501(a). Respondent, however, issued statutory notices of liability dated September 4, 1981, to each of the children and trusts before the period for assessment of their transferee liability expired. Secs. 6901(c)(1), (d)(1). In such notices, respondent determined that each child and trust was liable for the deficiencies in the Petersons' respective gift taxes for the calendar quarter ending June 30, 1976. Respondent calculated the deficiencies based on a $13 per share value for the 50,000 shares of Madison stock.Respondent also determined that the deficiencies were due to negligence or intentional disregard of rules and regulations, *399 and therefore asserted transferee liability for the section 6653(a) additions against each of the children and trusts. In the statutory notices to the children, however, respondent noted that their liability was limited to the fair market value of the gifts they received as determined by respondent, plus interest. See note 4, supra.
ULTIMATE FINDINGS OF FACT [18]
*400 1. Peterson's gifts to his children and to trusts for their benefit on April 9, 1976, were in substance gifts of the sales proceeds of a portion of his Madison stock under the stock purchase agreement of January 26, 1976. 2. The fair market value of the Madison stock and hence of the gifts on April 9, 1976, was $13 per share. 3. The Petersons' underpayments of gift tax were not due to negligence or intentional disregard of rules and regulations. OPINION I Assignment of Income
We are called upon to apply well-established legal principles to the facts of this case, but the factual determinations, not the legal principles, are the center of controversy. The first issue is whether the Petersons are taxable on the gain reported by their children and the trusts on the sale of the 50,000 shares of Madison stock Peterson gave them. In deciding this issue we are guided by well-established principles.Income is to be taxed to the person who earns or otherwise creates the right to receive it. Helvering v. Horst,311 U.S. 112, 120 (1940); Lucas v. Earl,281 U.S. 111, 114-115 (1930). *401 Such a person cannot escape taxation by anticipatory arrangements, however skillfully devised. Helvering v. Horst,supra,311 U.S. at 120; Lucas v. Earl,supra,281 U.S. at 114-115; Allen v. Commissioner,66 T.C. 340, 346 (1976). When a right to the proceeds and therefore the gain from the disposition of property has matured or ripened at the time of a transfer, the transferor will be taxed, notwithstanding a technical transfer of the property prior to its disposition. Estate of Applestein v. Commissioner,80 T.C. 331, 345 (1983); S.C. Johnson & Son, Inc. v. Commissioner,63 T.C. 778, 786 (1975). However, the mere anticipation or expectation of income at the time of the assignment does not give rise to a fixed right to income prior thereto. Estate of Applestein v. Commissioner,supra,80 T.C. at 345; Carborundum Co. v. Commissioner,74 T.C. 730, 740 (1980); S.C. Johnson & Son, Inc. v. Commissioner,supra,63 T.C. at 786. Thus, we must decide whether the Petersons should be relieved of taxation because Peterson transferred *402 the Madison stock along with the right to receive the gain from its sale (see Helvering v. Horst,supra) or whether they should be taxed because he had, in effect, "realized" the gain in the value of the stock before the gift such that the gift was an assignment of only a right to receive the gain. Estate of Applestein v. Commissioner,supra,80 T.C. at 342. The Petersons argue that the gift was not an anticipatory assignment of Peterson's right to the gain because, at the time of the gift, Peterson's right to the sale proceeds was contingent, citing Cold Metal Process Co. v. Commissioner,247 F.2d 864 (6th Cir. 1957); Grand Rapids Trust Co. v. Commissioner,34 B.T.A. 170 (1936); Walworth v. Commissioner,6 B.T.A. 788 (1927). [19] Respondent argues that Peterson's right to the sale proceeds was not contingent at the time of the gift, relying on our recent decision in Estate of Applestein v. Commissioner,supra. The taxpayer there transferred to custodial accounts for his children stock in a corporation after the corporation had entered into a merger agreement with *403 another corporation and after the shareholders of both corporations had approved the merger, but before its effective date. We held that the taxpayer was taxable on the gain resulting from the merger exchange because the transfers to the children's accounts represented anticipatory assignments of income. Estate of Applestein v. Commissioner,supra,80 T.C. at 345-347. Our decision turned on the timing of the transfers. Estate of Applestein v. Commissioner,supra,80 T.C. at 346. We explained that the date of stockholder approval was crucial. After the merger was approved, stockholders of the acquired corporation knew that, after the effective date of the merger, their stock could be exchanged pursuant to the merger. Thus, after stockholder approval, the transferred stock was nothing more than a vehicle for receipts of the merger proceeds. Estate of Applestein v. Commissioner,supra,80 T.C. at 345. *404 We relied on a number of cases holding that a transfer of stock following the adoption of a plan of liquidation is an anticipatory assignment of income and results in recognition of gain to the transferor. Estate of Applestein v. Commissioner,supra,80 T.C. at 343. See Jones v. United States,531 F.2d 1343 (6th Cir. 1976); Kinsey v. Commissioner,477 F.2d 1058 (2d Cir. 1973), affg. 58 T.C. 259 (1972); Hudspeth v. United States,471 F.2d 275 (8th Cir. 1972); Allen v. Commissioner,supra;Cook v. Commissioner,5 T.C. 908 (1945). See also Dayton Hydraulic Co. v. United States,592 F.2d 937 (6th Cir. 1979) (per curiam), cert. denied 444 U.S. 831 (1979). Cf. Kent v. Commissioner,170 F.2d 131 (6th Cir. 1948); Rushing v. Commissioner,52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971); Simmons v. United States,341 F. Supp. 947 (M.D. Ga. 1972); Charleston National Bank v. United States,323 F. Supp. 53 (S.D. W. Va. 1971). *405 These and other cases [20] suggest that the occurrence of a specific event regarding property (shareholder approval in the above cases) creates a right to income from the property such that a subsequent transfer of the property does not shift the tax on such income to the transferee.
We have also held that where a taxpayer entered into a binding contract to sell stock and then, before consummation of the sale, transferred the stock to members of his family or to a trust for their benefit, the taxpayer remained liable for the tax on the gain realized from the sale. Usher v. Commissioner,45 T.C. 205, 215 (1965). See also Salvatore v. Commissioner,434 F.2d 600 (2d Cir. 1970), affg. a Memorandum Opinion of this Court; [21]Rollins v. United States,302 F. Supp. 812 (W.D. Tex. 1969). The Petersons argue that the stock purchase agreement did not fix *406 Peterson's right to the gain from the sale of the Madison stock he gave to the children and the trusts because of the many conditions contained therein and the surrounding circumstances.
Whether a taxpayer possesses a right to receive income or gain is, of course, a question of fact, Estate of Bickmeyer v. Commissioner,84 T.C. 170, 175 (1985), each case turning on its own particular facts. Malkan v. Commissioner,54 T.C. 1305, 1314 (1970). The realities and substance of the events, rather than formalities and the technical possibility that the sale might be abandoned, must govern our determination of whether an anticipatory assignment of income occurred. Hudspeth v. Commissioner,supra, 471 F.2d at 277. We must determine whether by the time of the gifts, the sale was practically certain to be completed despite the remote and hypothetical possibility of abandonment. Estate of Applestein v. Commissioner,supra,80 T.C. at 346. See also Dayton Hydraulic Co. v. United States,supra,592 F.2d at 938; *407 Jones v. United States,supra,531 F.2d at 1345; Kinsey v. Commissioner,supra,477 F.2d at 1063; Allen v. Commissioner,supra,66 T.C. at 346. Although the principles stated above may aid our analysis, "a recitation of these truisms may not be substituted for a reasoned analysis of the crucial facts." Edgar v. Commissioner,56 T.C. 717, 738 (1971). Thus, we turn to the various contingencies the Petersons point to in arguing that the stock purchase agreement did not fix Peterson's right to the sale proceeds before he made the gifts. Peterson's Employment with IBP
The stock purchase agreement conditioned IBP's obligation to buy the Madison stock upon Peterson's executing and delivering to IBP, at IBP's option, a 10-year employment contract, a draft of which was attached to the stock purchase agreement. However, a close examination of the facts demonstrates that there was little substance to this supposed condition. Holman, IBP's chairman, desperately wanted Peterson to play an active role in IBP's management after the sale. Acquiring Peterson's services was clearly the primary purpose of *408 the acquisition. However, Holman, and therefore IBP, had absolutely no intention of requiring Peterson to sign an employment contract prior to consummation of the sale. If IBP did so, Armour could exercise its right of first refusal, purchase all Madison stock on the same terms as IBP, including the employment contract, and require Peterson to work for Armour. Furthermore, the tender offer document sent to Madison stockholders two days before the gifts did not list, among the conditions to IBP's obligations, any requirement that Peterson execute and deliver the employment contract. It noted, however, that Peterson had been offered employment by IBP, had neither accepted nor rejected the offer, but had indicated a willingness to negotiate with IBP if the sale and tender offer were consummated. Also, Peterson's counsel advised him not to sign the employment contract before the closing of the stock purchase transaction because he and FMA feared the public stockholders might argue that Peterson was receiving a greater purchase price for his stock than the rest of the shareholders. The 10-year employment contract was promptly executed two days after the closing. We are satisfied that *409 when IBP made the tender offer, which was made two days before the gifts, Holman had received sufficient assurances that, at a minimum, Peterson would be reasonable in negotiating employment terms after the sale and that IBP would get Peterson's services. There is no evidence suggesting the occurrence of any event after the gifts, further solidifying Holman's expectations. Thus, on these facts, we can hardly characterize this technical condition in the stock purchase agreement as a contingency sufficient to preclude the agreement from fixing Peterson's right to receive the proceeds from the sale. Eighty-five Percent Tender Requirement
The stock purchase agreement conditioned IBP's obligation to buy the Madison stock upon IBP's obtaining, through the agreement and the tender offer, the right to acquire at least 85 percent of all outstanding Madison stock. The tender offer document noted this condition. The Madison principals owned 500,200 shares or 63.3 percent of the outstanding Madison stock and warrants. Prudential held 65,000 outstanding Madison warrants. The remaining 224,800 shares of Madison stock and warrants were held by over 460 stockholders and 330 warrant holders *410 in relatively small lots. At least 171,300 shares of Madison stock and/or warrants had to be tendered by other Madison stock and warrant holders to meet the 85 percent requirement. Thus, the Petersons argue, a large number of other Madison stock and warrant holders had to in effect "approve" the sale by tendering their stock and/or warrants before IBP's obligation to buy the Madison stock was fixed. They contend that shareholder approval in such circumstances cannot be regarded as a mere rubber stamp. [22] The Petersons note that no publicly held shares or warrants were tendered before the gifts. Respondent, on the other hand, argues that there was no doubt that other Madison stock and warrant holders would tender their stock and/or warrants. We agree that these stockholders and warrant holders, representing minority interests in the corporation, were unlikely to reject such a good deal. The prices offered by IBP, $13 per share and $13 less exercise price per warrant, were almost three times the last bid price for the stock and about three times the market value of Madison's assets. In addition, both the stock purchase agreement and the tender offer document stated that if IBP *411 did not obtain the right to acquire at least 85 percent, then it could elect to buy the Madison stock and warrants tendered. The tender offer document also stated the various means by which IBP might eliminate stock and warrant holders who did not tender if IBP acquired less than 100 percent of all outstanding Madison stock and warrants. These statements suggest that IBP did not consider the 85 percent requirement to be absolute. The great likelihood that IBP would obtain the right to acquire at least 85 percent of all outstanding Madison stock and warrants because of the high price it was offering therefor, and IBP's evident willingness to ignore the minimum amply support our conclusion that the possibility that this requirement would prevent consummation of the acquisition was remote and hypothetical. Continuation of the Armour Custom Contract and Prudential Loan Agreement
Armour had the right to cancel the Armour custom contract and Prudential had the right to demand full payment of Madison's note if the Madison principals sold their stock. [23] If Armour cancelled the Armour custom contract *412 due to the sale, IBP would have to help Madison either enter into a similar arrangement with another company or establish its own buying operation and sales organization, which would take about 1-1/2 years and a substantial amount of money. If Prudential demanded payment of Madison's note, IBP would have to use part of its operating line of credit to pay it. IBP was in a somewhat uncertain financial situation at the time. There had recently been some intimations, but no real threats, that IBP's line of credit was in jeopardy. After Peterson made the gifts, at Holman's request, he met with representatives of Armour and Prudential to discuss continuing the Armour custom contract and the Prudential loan agreement. The Petersons argue that these facts make it clear that if either Armour or Prudential had indicated that they would not continue their arrangement with Madison after the acquisition, there would have been a material adverse event under the stock purchase agreement and IBP could have avoided buying the Madison stock. The Petersons recognize, however, that Armour could not cancel *413 the Armour custom contract and Prudential could not demand payment of Madison's note until after the transaction was consummated. The stock purchase agreement conditioned IBP's obligation to close upon the absence of any material adverse change in Madison's business, operations, or financial condition before the closing. Thus, neither Armour's cancellation nor Prudential's demand for payment would violate the material adverse change prohibition in the stock purchase agreement. They could not cancel or demand payment until after the sale. The prohibition was only effective before the sale. More importantly, there is no persuasive evidence that IBP intended to back out of the sale if, before the closing, either Armour indicated that it would cancel the Armour custom contract or Prudential indicated that it would demand payment of Madison's note. To the contrary, IBP stated in the tender offer document that Armour had not indicated that it intended to cancel the Armour custom contract, but that if Armour did so, IBP intended to operate Madison's plant for its own account. IBP also stated in the tender offer document that if Prudential demanded payment of Madison's *414 note, IBP intended to pay the note out of available corporate funds. Thus, the possibility that Armour would cancel the Armour custom contract or that Prudential would demand payment of Madison's note was not sufficient to make IBP's obligation to buy the Madison stock contingent. The Trucking Subsidiary
The stock purchase agreement conditioned IBP's obligations upon IBP's receipt of assurances that its purchase of Madison stock would not interfere with any license or permit held by Madison. Madison's wholly owned trucking subsidiary held an ICC trucking permit for the 48 contiguous states. Peterson estimated the permit's value at upwards of $1 million. IBP also owned an ICC regulated carrier, but it did not have trucking authority in all 48 states. Section 5 of the Interstate Commerce Act (49 U.S.C. sec. 5) requires prior ICC approval for the acquisition of one regulated carrier by another. IBP and the Madison principals knew from the outset that they could not obtain ICC approval before the proposed closing date. The day before the closing, IBP transferred all of the rights, title, and interest in the trucking subsidiary's stock that it would obtain *415 through the acquisition to a voting trust. Almost two months after the closing, the ICC denied IBP's application for permission to acquire control of the trucking subsidiary. However, the ICC eventually approved the voting trust arrangement. The trucking subsidiary continued to operate despite IBP's acquisition of Madison and despite the ICC's initial denial of IBP's application. The Petersons contend that IBP could have refused to close the sale because of the uncertainty surrounding its ability to obtain ICC approval of its acquisition of control over the trucking subsidiary. Therefore, they continue, IBP was not bound to buy the Madison stock, and Peterson had no fixed right to the sale proceeds. We disagree. Both IBP and the Madison principals knew at the time they signed the stock purchase agreement that ICC approval could not be obtained before the closing. Thus, from the beginning, they knew that if the stock purchase was to be consummated within the contemplated time frame, it would be done without the trucking subsidiary control issue being resolved. Moreover, the trucking subsidiary was not mentioned in the tender offer document as a potential problem. Consequently, *416 it certainly cannot be classified as a contingency that had to be resolved before consummation of the stock purchase, and thus as a real obstruction to Peterson's receipt of the sale proceeds. Antitrust Challenges
Since 1973, IBP had been investigated by a number of Federal regulatory agencies that had, on various occasions, alleged that IBP was too big and that it was monopolizing the beef packing industry. IBP grew rapidly, primarily by acquiring other packing plants. By 1976, it was the largest meat packing company in the United States. IBP was subject to a consent decree prohibiting it from acquiring beef packing plants in certain states. IBP thought it possible but not probable that the Justice Department might argue that the consent decree precluded IBP from acquiring a pork processing plant as well, or that the acquisition violated section 7 of the Clayton Act (15 U.S.C. sec. 18) on the theory that IBP was using its power in one market to enter another. Four days after the parties entered into the stock purchase agreement, a Justice Department attorney wrote to IBP's counsel requesting an explanation of why the acquisition would not violate *417 the consent decree. IBP's counsel responded that the consent decree applied only to beef packing plants, and Madison was in the pork packing business. The Petersons argue that these facts show that the threat of an antitrust challenge was very real and could have prevented consummation of the stock purchase. However, the parties, at Peterson's insistence, specifically addressed this possibility in the stock purchase agreement. That agreement specifically stated that IBP's obligation to purchase the Madison stock wasnot conditioned upon the absence of a governmental challenge to the acquisition.It also provided that if there was such a challenge, IBP would take all steps necessary and legally permissible to ensure that the stock purchase would be consummated. The agreement further suggested that if the transaction was challenged, IBP could pay the purchase price into a trust that would receive tendered stock, pay the purchase price to the selling stockholders, and hold the stock pending resolution of the challenge while operating Madison for IBP's benefit. We think these provisions in the stock purchase agreement clearly evidence the parties' intentions to consummate *418 the stock purchase despite any potential governmental challenge. In addition, IBP had previously acquired two other pork plants, and there is no evidence that those acquisitions had been subject to antitrust challenges. Finally, the tender offer document made no mention of the possibility that the transaction could be derailed by antitrust considerations. Thus, we conclude that there was no real threat of governmental interference with the consummation of the stock purchase. Personalities
Each of the Madison principals (Peterson, Anderson, and Lauridsen) had worked at IBP before and had had disagreements with Holman, IBP's chairman. The Petersons argue that this fact along with Holman's erratic behavior created a contingency that made it impossible to predict whether the sale would be consummated. Other facts discredit their argument. The Madison principals viewed IBP's offer as substantially greater than the value of Madison's assets, about triple the fair market value of the assets. Because the offer included such a premium, the Madison principals were very willing to sell out. IBP's $18.3 million offer represented about $1 million more for Peterson's stock than *419 the earlier $13 million offer. Moreover, Peterson was the driving force behind Madison and was the negotiator for the Madison principals. There is no probative evidence that the alleged personality conflicts between Anderson and/or Lauridsen on one hand and Holman on the other hand could have interfered with the stock purchase in any way. Peterson and Holman had had conflicts in the past. In 1969 when Peterson announced that he was leaving IBP, Holman cried and asked him not to go. When Holman realized that Peterson was not going to change his mind, Holman told him to get out and called him unkind names. However, before he left IBP, Peterson had been known as Holman's "golden boy," In fact, one of the reasons Peterson left IBP was that he was so closely associated with Holman that Peterson wondered whether his success was due to his own ability or due to his relationship with Holman. As early as 1974, Holman was trying to get Peterson to return to work for IBP. By December of 1975, IBP was desperately in need of good top management. Peterson was a "superstar" in the industry. IBP had recently lost a number of executives, and Holman was approaching retirement. Holman recognized *420 Peterson's abilities and had been trying to get Peterson to return to IBP since at least early 1974. Holman was determined to obtain Peterson's services for IBP. The Madison principals knew that IBP's offer bore a substantial premium over Madison's value and were very willing to sell out. These and other facts amply support our conclusion that because of the desire of all of the parties to close the transactions, their possible personality problems did not create any contingency to its ultimate consummation. Miscellaneous Conditions
The Petersons also argue that "there could have been many [other contingencies], such as strikes, damage to the plant, tax assessments, etc. which would have killed the deal under the numerous warranties and conditions of the Sale and Purchase Agreement." We consider all such possibilities clearly remote and hypothetical and therefore of no consequence. See Estate of Applestein v. Commissioner,supra,80 T.C. at 346. [24]
Absence of Arbitrage Activity
Neither FMA, the only market marker in Madison stock, nor anyone else arbitraged the *421 stock purchased. The Petersons argue that this demonstrates the substantial nature of the contingencies that existed. However, FMA's decision not to arbitrage the transaction was not unusual because it seldom arbitraged transactions. FMA had arranged financing for, conducted extensive research on, and generally followed both IBP and Madison since their inception. In addition, FMA helped prepare the tender offer document and acted as solicitation agent for the tender offer. The relatively small size of the transaction and the historically thin trading in Madison stock lessened the likelihood of arbitrage activity by others. We think these facts, rather than the purported contingencies, adequately explain the absence of arbitrage activity with respect to the transaction. In sum, the above analysis of the particular circumstances that the Petersons argue constituted contingencies to consummation of the stock purchase reveals that, at best, they represent remote and hypothetical possibilities that the stock purchase would be abandoned. Our consideration of the "totality" of the facts and circumstances, see Blake v. Commissioner,697 F.2d 473, 480 (2d Cir. 1982), *422 affg. a Memorandum Opinion of this Court, [25] confirms this conclusion. As previously mentioned, IBP was desperately in need of good top management. Peterson was a key figure in IBP's rapid growth and had been known as the "golden boy" at IBP. He was recognized as a "superstar" in the industry. However, he left IBP and was, at the time, running Madison, a pork packing plant he set up with Anderson and Lauridsen. Peterson refused Holman's earlier attempt to entice Peterson to leave Madison, and, in Holman's words, "come back home" to IBP. Peterson, Anderson, and Lauridsen also rejected IBP's prior offer to buy Madison. However, when IBP offered $13 per share, all three of them were very willing to sell, despite their past difficulties with Holman. They were going to receive $13 per share for stock they had purchased at $1 per share a little over four years earlier. Madison had only been in operation for two years. The public Madison stockholders would also make quite a profit by tendering their stock. These minority stockholders too would receive $13 per share for stock that was originally offered to the public at $1 per share about three years earlier and had never publicly *423 traded at more than $5 per share. The warrant holders, also a minority group, would receive $13 per warrant less the exercise price. Holman, and therefore IBP, was willing to pay such a premium because Peterson was "worth every penny." In addition, the tender offer document sent to other Madison stockholders and warrant holders two days before the gifts indicated that IBP foresaw no major obstacles to consummation of the acquisition. Based on the record as a whole, we hold that when Peterson gave 50,000 shares of Madison stock to his children and the trusts, his right to the proceeds from the sale of the stock had sufficiently matured or ripened so that the gifts were in substance gifts of the sale proceeds rather than the stock itself. Thus, the Petersons, and not the children and the trusts, are liable for the income tax on the sale of the 50,000 shares of Madison stock. II Fair Market Value
The above holding virtually resolves the issue as to the fair market value of the gifts. Section 2501 imposes a tax on gifts made by an individual. *424 Section 2512(a) provides that if a gift is made in property, the value of the property at the date of the gift shall be considered the amount of the gift. The fair market value of property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Sec. 25.2512-1, Gift Tax Regs.; United States v. Cartwright,411 U.S. 546, 551 (1973); Palmer v. Commissioner,523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684, 696 (1974); Georgia Ketteman Trust v. Commissioner,86 T.C. 91, 98 (1986). The determination of fair market value is a question of fact to be determined on the basis of the entire record. Georgia Ketteman Trust v. Commissioner,supra,86 T.C. at 98; Estate of Palmer v. Commissioner,86 T.C. 66, 71 (1986). However, we have broad discretion to determine which facts are most important in reaching a determination because "finding market value, is, after all, something for judgment, experience, and reason on the part of *425 the trier, and does not lend itself to dissection and separate evaluation." Colonial Fabrics, Inc. v. Commissioner,202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court, [26] cert. denied 346 U.S. 814 (1953). Petitioners argue that the fair market value of the 50,000 shares of Madison stock was $4.50 per share, the bid price for the stock on January 12, 1976, the last day Madison stock publicly traded. They state that under section 25.2512-2(b), Gift Tax Regs., the last bid price is normally the determining factor. To support their valuation, petitioners rely on factors described in sections 25.2512-2(e) and (f), Gift Tax Regs., and others, such as the appropriateness of a blockage discount because the stock given was not registered and was an extremely large relative to the number of shares changing hands in sales; the inappropriateness of a control premium because the 50,000 share block was a minority interest; Madison's book value and earnings per share, failure to pay dividends, limited profit potential, and high degree of leverage; and overall market conditions at the time of the gift. See *426 note 17, supra. Petitioners also rely on the expert opinion of Charles J. Burmeister, FMA's president and chief executive officer from 1974 until 1982. FMA was the only market maker in Madison stock. Mr. Burmeister opined that, based on the above factors, the stock had a fair market value of $4.50 per share on the date of the gift. We must, however, weigh opinion evidence in light of all other relevant evidence. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court, [27] cert. denied 356 U.S. 950 (1958). While the factors considered by Mr. Burmeister would be quite relevant in a different context, we simply cannot view the gifts to the children and trusts in the abstract and wholly apart from the stock purchase agreement, as he does. We also do not see the purported contingencies to the stock purchase agreement as Mr. Burmeister apparently perceived them to be. We think the view is different when the totality of the facts and circumstances is considered. Mr. Burmeister simply was not as close to the transactions as Holman and Peterson, the principals negotiating the deal. Mr. Burmeister testified *427 that he did not learn of Peterson's gifts to his children until sometime later, after May of 1976. The Court is satisfied that on the date of the gifts, April 9, 1976, two days after IBP's tender offer, Holman and Peterson had their deal. We held in Part I of this Opinion that when Peterson made the gifts, his right to the proceeds from the sale had substantially ripened so that the gifts were in substance gifts of the sale proceeds rather than the stock itself. Thus, the property which was the subject of the gifts, and whose vlue we must determine, is the sale proceeds. The sales price was $13 per share. Thus, the fair market value of the gifts was $13 per share. III Negligence Addition
The final issue is the negligence addition to the gift tax.Section 6653(a) imposes an addition to the gift tax if any part of an underpayment of the tax "is due to negligence or intentional disregard of rules and regulations." In general, for purposes of section 6653(a), negligence is lack of due care or failure to do what a reasonable and ordinarily *428 prudent person would do under the circumstances. Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168[28] (1964), cert. denied 389 U.S. 1044 (1968); Neely v. Commissioner,85 T.C. 934, 946 (1985). Respondent's determination of negligence or intentional disregard of rules and regulations is presumptively correct, and petitioners bear the burden of proving error therein. Neely v. Commissioner,supra,85 T.C. at 946. Thus, petitioners must show that the Petersons acted reasonably and prudently and exercised due care in reporting the fair market value of the gifts as $4.50 per share on their gift tax returns. See Neely v. Commissioner,supra,85 T.C. at 946. Respondent argues that because of Peterson's intimate knowledge of the transaction, he knew, or reasonably should have known, that on April 9, 1976, the date of the gifts, the fair market value thereof was greater than $4.50 per share, the bid price for the stock on January 12, 1976, the last day it publicly traded. Peterson was, *429 in effect, the subject of the transaction. IBP was acquiring Madison to obtain his services. He knew this was IBP's purpose and that IBP had initiated the tender offer fully intending to consummate the acquisition. He also knew that the $13 per share purchase price represented a substantial premium to him, the other Madison principals, and the public stockholders. He therefore knew that at least he and the other Madison principals fully intended to sell their stock to IBP. Respondent also argues that the gift tax returns failed to disclose the existence of the stock purchase agreement in a meaningful way and were misleading. An attachment to Peterson's gift tax return stated that the last bid price for Madison stock was $4.50 per share and that "in accordance with Reg. § 25.2512-2, the last bid price * * * was determined to represent the fair market value of the * * * [Madison stock] on the date of the gift." The Petersons' gift tax returns did not mention the existence of the stock purchase agreement or the $13 price. Petitioners point out that the agreement was mentioned in the trust agreements attached to Peterson's return. However, these references appear on the 12th *430 and 26th pages of the return and attachments in the middle of the last paragraph of the trust agreements. Thus, the Petersons' gift tax returns could be viewed as at least misleading. Petitioners argue that the Petersons relied on the advice of Peterson's estate planning legal counsel, his financial advisors at FMA, and the accountant who prepared the returns in using the $4.50 per share value, and that such reliance avoids the negligence addition, citing Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272 (1976). Petitioners also contend that the Petersons had reasonable grounds to report the value at $4.50 per share, which precludes imposition of the addition, citing Kappel v. United States,369 F. Supp. 267, 272 (W.D. Pa. 1974). They say that Peterson justifiably believed that the stock purchase agreement had very little effect on the fair market value of the gifts. While Peterson may not have known that the stock purchase agreement so fixed his right to the sale proceeds that the gifts were an anticipatory assignment thereof, by the date of the gifts, he reasonably should have known that the fair market value thereof was *431 certainly greater than the $4.50 per share reported on the gift tax returns. Reliance on expert advise does not necessarily insulate the taxpayer from the negligence addition. Perrett v. Commissioner,74 T.C. 111, 134 (1980), affd. without published opinion 679 F.2d 900 (9th Cir. 1982).Under the circumstances of this case, especially with Peterson's intimate knowledge of the transaction, such reliance perhaps should not be considered a defense. See Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 740 (1973). As indicated above, we think Peterson and Holman knew more than anyone else exactly what was going on and when the deal had sufficiently jelled to be considered "a done deal." Based upon the record as a whole, we have concluded that that had occurred by April 9, 1976, the date of the gifts. However, where the case is such a close one and where so many qualified professionals advised Peterson that he could report the gifts at $4.50 per share, we are reluctant to find negligence or intentional disregard of rules and regulations. We *432 think this is an instance where the taxpayer (Peterson) did not really "know" what he knew or at least did not understand the full implications of what he knew. The principal issue in the case has been vigorously litigated. There are facts going in both directions. The Court's ultimate factual conclusion depended upon weighing and evaluating the various bundles of facts and drawing inferences and conclusions from the record as a whole. In view of the closeness of that principal factual issue, we think a finding of negligence or intentional disregard of rules and regulations is unwarranted. Based on the entire record, we hold that those petitioners against whom respondent determined the negligence additions are not liable therefor. To reflect the foregoing, Decisions will be entered for the respondent except as to the additions under section 6653(a).
Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert L. Peterson Irrevocable Trust #1 for the Benefit of Mark R. Peterson, Transferee, Union Bank and Trust Company, Trustee, docket Nos. 29264-81, 29267-81; Susan P. Peterson, Transferee, docket Nos. 29265-81, 29270-81; Mark R. Peterson, Transferee, docket Nos. 29266-81, 29271-81; Robert L. Peterson and G. Virginia Peterson, docket No. 29268-81; Robert L. Peterson Irrevocable Trust #2 for the Benefit of Susan P. Peterson, Transferee, Union Bank and Trust Company, Trustee, docket No. 29269-81.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.↩
3. Respondent determined alternatively that if such shares were given to the children prior to the sale, the Petersons realized long-term capital gain in the amount of $48,640 because the gift taxes to be paid by their donees (as determined by respondent) exceeded Mr. Peterson's basis in the stock. See Diedrich v. Commissioner,457 U.S. 191 (1982). On brief, respondent conceded that alternative position and agreed that the Petersons did not that alternative position and agreed that the Petersons did not realize any such gain during 1976 because they are cash basis taxpayers and the amount of gift taxes paid by their donees during 1976 did not exceed Mr. Peterson's basis in the stock. See Estate of Weeden v. Commissioner,685 F.2d 1160↩ (9th Cir. 1982), which addressed this "timing" issue and held that any such income is taxable to the cash basis donor in the year the donee pays the donor's gift tax, not in the year of the transfer of the property.
4. This limitation does not apply to interest accruing after the issuance of the notices of liability. Poinier v. Commissioner,86 T.C. 478, 487-490↩ (1986).
5. The parties stipulated that Madison stock sold at $3 per share in the public offering. The Court will not lightly disregard a fact agreed to by the parties in the stipulation. Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). However, in unusual circumstances, when a stipulated fact is clearly contrary to the record presented to us at trial, the Court will not be bound by the stipulation. Mead's Bakery, Inc. v. Commissioner,364 F.2d 101 (5th Cir. 1966), affg. on this issue and revg. on other issues T.C. Memo. 1964-104; Jasionowski v. Commissioner,supra,66 T.C. at 318↩. The prospectus for the offering stipulated into evidence indicates a $1 per share price for the 25 shares of Madison stock included as part of the investment unit. However, the trading records of FMA show purchases and sales of Madison common stock at various prices from $3 to $4 to $5 in 1973. If there is any inconsistency with the parties' stipulation, we need not resolve the matter.
6. Where appropriate, any reference to a Madison principal includes the Madison principal's related parties.↩
7. Where appropriate, any reference to Madison stock includes Madison warrants, and any reference to Madison stockholders includes Madison warrant holders.↩
8. One witness speculated that the $4.50 price reflected some anticipation of the IBP purchase deal, but the record does not establish that to be the fact. The FMA trading records show that the Madison stock traded at $4.50 and above in 1975. There is no evidence in the record of any inside information having driven up the Madison stock price at any time before the halt of public trading.↩
9. Stock certificates dated April 9, 1976, and evidencing the stated number of shares of Madison stock were issued to each donee. Respondent argues that in substance Peterson made gifts of the right to receive the proceeds from the sale of such Madison stock rather than the Madison stock itself. For convenience, we refer to the gifts in the form in which they were made, that is, gifts of Madison stock. We will address respondent's argument in the Opinion below.↩
10. Mrs. Peterson, as custodian for the children, and the trustee under the trusts executed documents assigning the Madison stock Peterson gave them. Respondent contends that the Madison stock in form sold by Mrs. Peterson, as custodian for the children, and by the trustee under the trusts was in substance sold by Peterson. For convenience, we refer to the sellers as those persons who in form sold the stock. We will address respondent's argument in the Opinion below.↩
11. If there was some other written employment contract executed, petitioners failed to make it part of the record. At trial Peterson testified that he and Holman also orally agreed at that time that if Peterson would help find a new president for IBP and get such a person situated, he (Peterson) could then leave IBP. The Court did not believe this testimony. Such an oral agreement would completely defeat Holman's whole purpose in having IBP pay a premium price for the Madison stock to secure Peterson's services with IBP. Also, the Court is satisfied that Peterson is too meticulous in this contractual dealings, as shown by the extreme care he took in drafting and executing of the trusts for the children, to have executed a written employment contract for 10 years and at the same time to have entered into an oral agreement that completely undercut his written agreement.↩
12. $1,516,671 gross sales price (116,667 shares X $13 per share) less $116,667 cost basis. ↩
13. $71,500 gross sales price (5,500 shares X $13 per share) less basis of $7,426 (Peterson's cost basis of $5,500 + $1,926 gift tax paid). ↩
14. $253,500 gross sales price (19,500 shares X $13 per share) less basis of $26,326 (Peterson's cost basis of $19,500 + $6,826 gift tax paid). ↩
15. A copy of the corresponding trust agreement was attached to each fiduciary return.↩
16. Madison stock did not publicly trade after January 12, 1976. ↩
17. According to Peterson's counsel and financial advisor, they relied on a variety of factors in advising Peterson. Madison stock did not publicly trade after January 12, 1976. The last quoted bid price on that date was $4.50 per share. There reported high and low bid prices for Madison stock and publicly held warrants for the calendar periods indicated, as reported by the National Quotation Bureau, Incorporated, were as follows: Publicly
Held
Warrants
Shares
High
Low
High
Low
1973
2-5/8
1-1/8
4-5/8
3
1974
First Quarter
1-3/4
1
3-7/8
3-3/8
Second Quarter
1-3/4
1
3-1/2
3-1/4
Third Quarter
1
1/4  3-1/4
2-1/4
Fourth Quarter
1/4  1/4  2-1/4
2-1/4
1975
First Quarter
not quoted
not quoted
Second Quarter
1
1/4  3-3/4
2-1/4
Third Quarter
1-1/4
1-1/8
4-1/4
4
Fourth Quarter
1-3/8
1-1/8
4-3/8
4
Trading in Madison stock had been very thin. Only 14,190 shares traded in 1973, 3,065 shares traded in 1974, and 15,175 shares traded in 1975. Madison stock never traded at more than $5 per share. The book value of Madison stock on October 25, 1975, the end of its last fiscal year before the gifts, was $1.50 per share fully diluted. The unaudited book value at January 31, 1976, was $2.60 per share fully diluted. The $4.50 bid price was approximately 173 percent of Madison's book value. The stocks of other, more established meat packers with better earnings records were selling at substantial discounts from book value. Madison earned 64 cents per share during its fiscal year ended October 25, 1975, yielding a price-earnings ratio of about 7 to 1. At that time, price-earnings ratios in the meat packing industry were generally in the 5 to 7 range. Madison had never paid a dividend. However, Madison had been in operation for only two years, and would not be expected by pay dividends in the early years of its existence.↩
18. Both parties submitted requested findings of fact that were, with a few exceptions, reasonably accurate and generally supported by citations to testimony and/or exhibits in the record. However, rather peculiarly and repeatedly, respondent objected to petitioners' requested findings of fact as "not supported by the record." Respondent did this despite petitioners having clearly cited sworn testimony or exhibits in support of their requested findings.We can only surmise that respondent was challenging the credibility and/or weight to be accorded to some of the testimony or the inferences or conclusions to be drawn from the evidence. If so, respondent, in many instances, did not favor us with his analysis and arguments in that regard. Actually, there are relatively few disputed primary facts in this essentially factual case. The factual dispute goes to the totality of the facts and circumstances, i.e., how the fact finder assembles and weighs the various strands of primary facts to reach reasoned ultimate findings of fact based on the record as a whole. The case was well tried and well briefed by both sides. Each party carefully marshaled the evidence supporting his respective position, but the facts untidily point in both directions. This is a very close factual case, the kind of case the parties are unlikely to be able to settle, and the kind of case litigants commit to the particular province of the fact finder.↩
19. While these cases contain language helpful to the Petersons' position, they involve different issues and distinguishable facts, and the precedential value of the latter two is at least questionable. In Cold Metal Process Co. v. Commissioner,247 F.2d 864, 872 (6th Cir. 1957), the Court of Appeals for the Sixth Circuit held that the taxpayer was not taxable on license royalties and infringement claims on patents it had distributed in dissolution when, at the time of the distribution, the taxpayer's legal right to such income was being strenuously litigated by the government and there was no certainty at the time of the distribution that the taxpayer's right thereto would ever be established or that the money would be paid to it or its distributees. In Grand Rapids Trust Co. v. Commissioner,34 B.T.A. 170, 171-173 (1936), the Board of Tax Appeals held that the taxpayer was not taxable on the full proceeds from the sale of stock its decedent had sold to a family-owned corporation on an installment contract when, prior to the sale to the corporation, the decedent had entered into a contract to sell the stock at a future date if the purchaser elected then to purchase. Walworth v. Commissioner,6 B.T.A. 788 (1927), involved a taxpayer who contracted to sell real estate in the future, gave a one-half interest in the real estate and contract to his wife, and then consummated the sale. The Board held that when the sale was consummated the taxpayer was taxable only upon the profit from the sale of his one-half interest. Walworth v. Commissioner,supra,6 B.T.A. at 791. This Court, however, has observed that "Grand Rapids Trust Co.,supra, must be read in the light of the fact that it was decided in 1936, 9 years before the Supreme Court's decision in Commissioner v. Court Holding Co.,324 U.S. 331." Hallowell v. Commissioner,56 T.C. 600, 610 (1971). (Fn. ref. omitted.) Thus, its precedential value, especially in this case, is at least questionable. Walworth v. Commissioner,supra, is yet an older case, having been decided even before Lucas v. Earl,281 U.S. 111 (1930). The Petersons also cite Thompson v. Commissioner,T.C. Memo. 1964-198↩. There, the taxpayer sold stock in a corporation under an installment contract with a collateral agreement that the purchaser could withhold a portion of the interest payments due the taxpayer to pay part of any deficiency in the corporation's income taxes. After rejecting the Commissioner's primary argument that the taxpayer did not constructively receive the withheld interest, we held that the taxpayer did not have any right to the interest, if at the time it became due, the corporation owed any taxes. Therefore, the taxpayer did not realize any income due to the withheld interest, and the purchaser's payment of the corporation's taxes out of the withheld interest was not an anticipatory assignment of income.
20. Smith's Estate v. Commissioner,292 F.2d 478 (3d Cir. 1961), affg. 34 T.C. 842 (1960), cert. denied 368 U.S. 967 (1962); Doyle v. Commissioner,147 F.2d 769 (4th Cir. 1945), affg. 3 T.C. 1092↩ (1944).
21. T.C. Memo. 1970-30↩.
22. See Perry v. Commissioner,T.C. Memo. 1976-381↩.
23. Prudential could also demand payment if Armour cancelled the Armour custom contract.↩
24. Cf. Perry v. Commissioner,T.C. Memo. 1976-381↩.
25. T.C. Memo 1981-579↩.
26. Dated January 22, 1951.↩
27. T.C. Memo. 1956-178↩.
28. And T.C. Memo. 1964-299↩.